[No. S017868. May 7, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH MUSSELWHITE, Defendant and Appellant.

1218

1224

**COUNSEL**

Michael B. McPartland, under appointment by the Supreme Court, and Carl A. Gonser for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General,

W. Scott Thorpe and David A. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN, J.**—After 26 days of trial, a capital jury convicted defendant of 1 count of murder of the first degree. (Pen. Code, § 187, subd. (a); all undesignated statutory references are to the Penal Code.) It also found defendant guilty of three counts of burglary, two counts of robbery, and one count of attempted murder. (§§ 459, 211, 664/187.) Two special circumstances alleged in the information—that the murder occurred in the course of the commission of a robbery and a burglary, two of the felonies enumerated as special circumstances in our capital statute (see former § 190.2, subd. (a)(17)(i), (vii); now § 190.2, subd. (a)(17)(A), (G))—were also found true, as were allegations that defendant had personally used a knife in the commission of all but one of the burglaries, had personally used a hammer in the commission of a burglary, a robbery, and the attempted murder, and had personally inflicted great bodily injury upon the victim of the robbery and the attempted murder. (§§ 12022, subd. (b), 12022.7.)

Following a nine-day penalty trial, the jury sentenced defendant to death on the first degree murder count; the trial court imposed the upper term of nine years on the attempted murder count, a one-year enhancement for the use of a knife, and a three-year enhancement for the infliction of great bodily injury for a total determinate term of thirteen years; sentencing on the remaining counts was stayed under section 654. The superior court subsequently denied a motion to reduce the death sentence to life in prison without possibility of parole, and directed that judgment be entered on the jury's verdicts. The direct appeal to this court is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. FACTS

### A. Guilt Phase

1. *The prosecution's case: The robbery and attempted murder of Shawn May.*

On November 30, 1987, Shawn May, then 18, was working alone as a sales clerk at the Video Mart in Sacramento. Around midafternoon, defendant entered and began looking through the videotape rentals. As May walked

out from behind the front counter, she noticed a dollar bill lying on the floor. She picked it up, returned behind the counter to the cash register, and asked defendant if the bill belonged to him. Told that it did not, May placed the money in the store's register, remarking that it would save her from being short at the end of the day. Defendant then said, "Well, it's going to be a lot shorter than you think," and grabbed May by the neck from behind. Holding the blade of a small knife to her throat with one hand, he reached into the cash register with the other and removed about $100 in cash.

Defendant then told May to lock the front door to the store. After getting her keys, May did so, turning over the "OPEN" sign so that it read "CLOSED" to passersby. Defendant then demanded that May tell him where more money was hidden. The telephone rang; defendant answered it. "Video store," he said. The store was busy, he told the caller; he had to go. Hanging up the telephone, defendant again demanded to know where additional money was kept. May led him to a back room and showed him $100 in bills in a metal file cabinet which he pocketed. By now, customers had begun to gather outside the locked entrance to the Video Mart.

Placing May on a chair in the back room, defendant grabbed a nearby roll of duct tape, bound her hands and feet with it and placed tape over her eyes and mouth. May told defendant he could leave by the back door. Defendant rummaged around, May testified at trial, before suddenly ripping the tape from her eyes, mouth and arms. He needed the key in the cash register, he told her. Walking May to the front counter by holding onto her shirt, kneeling down so that he could not be seen by the customers waiting outside, defendant directed May to take the key and give it to him. She did so, and the two returned to the back room. Defendant said little as he taped May to the chair, and retaped her eyes. He told her to be quiet, all he wanted was the money.

Defendant took some cash and May's automated teller machine card from her purse. After asking for her personal identification number (May made up one), he again fell silent. May could still see defendant's feet through the gaps in the tape, however, and after a few moments said, "I know you're still here." She felt a blow to her head, followed by something sharp striking the side of her neck. Defendant had picked up a hammer lying nearby and struck May, then stabbed her in the neck. After defendant left by the back door, May was able to remove the loose tape from her hands and feet and, bloodied, open the store entrance to the waiting customers who came to her aid.

### 2. *The robbery and murder of Norma Painter.*

On the afternoon of December 7, a week after the Shawn May incident at the Video Mart, defendant walked into the office of Norma Painter, the

53-year-old manager of the Cottonwood Apartments in Sacramento, and asked to see an apartment. After leaving briefly (he was observed, a tenant later testified, standing next to a nearby laundry room), defendant returned to Painter's office and asked for a rental application. Painter pointed to a pad of blank applications and told him to help himself. He did so, sitting in Painter's office and filling out the application form using a fictitious name. After he had completed the rental application, Mrs. Painter showed defendant unit No. 24, a model apartment kept vacant for that purpose. Alone with Mrs. Painter in the apartment, defendant struck her—probably with his fist, according to a forensic pathologist at trial—on the left eye and left temple, the mouth, the right arm and wrist, and her thighs. He then bound her ankles by knotting her pantyhose, and her hands by looping the maroon-colored belt from her dress and tying it. Shawn Coleman, a tenant in apartment No. 22, next door to No. 24, testified at defendant's trial that she had been folding freshly laundered clothes on the afternoon of December 7, when she heard a woman cry out, "No, no, leave me alone, don't do that." The subsequent police investigation of the crime scene at the Cottonwood Apartments revealed that a length of white cord from a venetian blind covering one of the windows of apartment No. 24 had been cut, tied around Mrs. Painter's neck and pulled taut. In addition to this ligature, Painter had been stabbed with a pocket knife four times on the right and left side of the neck, opening the jugular veins at both locations. She had died, according to the pathologist's testimony, "as a result of ligature strangulation, along with incised injuries of the neck." The prosecution's evidence at trial indicated that defendant then left apartment No. 24, returned to the Cottonwood rental office, and took Mrs. Painter's wallet from her purse, along with cash and checks from the office desk. After removing the handset from the telephone cradle, he left.

### 3. *The defense case.*

The defense conceded that defendant was responsible for the death of Norma Painter. It asserted, however, that he suffered from organic brain damage which, compounded by extended crack cocaine abuse, prevented him from forming the mental state required for the commission of murder of the first degree. Defendant had not, the defense contended, premeditated, deliberated or acted out of malice in killing Norma Painter because he was incapable of forming those mental states. Defendant was acting randomly when he killed Painter, the defense asserted, and her homicide did not occur during the commission of a felony. The defense opened by calling Ann Schade, a medical technician. Schade testified that she had administered EEG (electroencephalogram) and BEAM (brain electrical activity mapping) tests on defendant and forwarded the results to Dr. Arthur Kowell, a neurologist, for analysis and interpretation.

Dr. Kowell testified that defendant's EEG trace appeared to be within normal limits. The BEAM test results, however, revealed abnormalities in the right temporal region of defendant's brain. According to Dr. Kowell's testimony, people with such brain abnormalities may have memory and attention deficits. Impairments in speech, emotion, and impulse control are also common in such people, who tend to be easily irritated. The defense also relied on the testimony of witnesses who had observed defendant around the time of Mrs. Painter's murder and described his behavior as nervous or "hyper." It called Dr. Fred Rosenthal, a psychiatrist who is board certified in neurology. Rosenthal had reviewed the results of the BEAM test on defendant and interviewed him and family members. It was on that basis that Dr. Rosenthal concluded defendant had sustained organic brain damage to the right temporal and perhaps the frontal lobes, damage that had been exacerbated by the extended use of drugs and alcohol since defendant's early teens.

In Dr. Rosenthal's opinion, habitual abusers of cocaine are emotionally unstable and irritable. They tend to overreact, even after ceasing drug use for a period of weeks; extended use may produce symptoms of psychosis and hallucinations. Defendant's history, according to Dr. Rosenthal's testimony, was consistent with that of a cocaine addict whose symptoms were becoming gradually overwhelming, making him increasingly dysfunctional. In Rosenthal's opinion, a hypothetical cocaine user with defendant's history would not have been capable of deliberation. Instead, he would have acted rashly and on impulse.

4. *Rebuttal and surrebuttal.*

On rebuttal, the People called Dr. Michael Adelberg, a neurologist. Relying on defendant's EEG results and a general skepticism of the BEAM test and the utility of its results for diagnostic and forensic purposes, Dr. Adelberg testified that in his opinion defendant showed no evidence of brain damage. The BEAM machine used to test defendant, according to Dr. Adelberg, had been removed from its previous location at the Sierra Vista Hospital because it tended to produce unreliable diagnoses.

Contesting Dr. Adelberg's testimony, Dr. Robert Bittle, a neurologist formerly on the Sierra Vista Hospital Board of Directors, testified that the BEAM machine was of great diagnostic value and that, to his knowledge, the unit at Sierra Vista Hospital had not been removed from that location because of incidents of misdiagnoses.

Defendant did not testify. The defense acknowledged that he committed the offenses charged.

## B. *Penalty Phase*

### 1. *The prosecution's case.*

Six days before his encounter with Shawn May at the Video Mart, defendant entered another video store—Eagle's Video Showcase—in Fairfield, California, around 8 p.m. He asked Gina R., the employee on duty, if the store had a copy of "The Platoons," a misnomer, apparently, for the film PLATOON (Hemdale Film Corp. 1986). After Gina R. told him they did not, defendant left. He returned a few minutes later, however, and began to browse through the rental tapes. After the other customers had left, defendant grabbed Gina R. from behind in a headlock and placed a five-inch knife blade to her throat. "Don't do anything stupid," he told her, "I won't hurt you." Holding onto Gina R., he walked her over to the cash register, reached in and took between $100 and $150.

Defendant then demanded to know the location of additional money; Gina R. told him there was more in the back of the store. With defendant still holding onto her, the two walked to the rear of the store where defendant took an additional $100 to $200 in bills. He then walked Gina R. to the bathroom, where she kept her purse. There, he took all the money in the purse as well as an earring and a necklace Gina R. was wearing. Using tape and twine lying nearby, defendant bound Gina R.'s hands and put tape over her eyes and mouth. Pulling up her blouse, he had begun to fondle her breasts when a bell on the front door rang and a customer entered. Telling her not to do anything "stupid" and "If you come out of here, I'm going to kill you," defendant walked to the main part of the store. Impersonating an employee, he told the customer the store's computer was down and that no movies could be rented. The customer left.

Defendant then returned to the bathroom and bound and gagged Gina R. Sitting on a chair, he pulled down her pants and underwear and copulated her orally. After a few minutes, he unzipped his pants and said to Gina R., "My father's been deprived" or "I've been deprived, my father's in prison." Then he raped her. In the midst of the rape of Gina R., the front doorbell rang again. Through a slit in the tape covering her eyes, Gina R. could see defendant put down the maroon folding knife he had been holding and reenter the main room of the store. The customer, a man, "just kept talking and talking and talking"; Gina R. sensed defendant was "getting very very nervous. Very shaky." Eventually, the customer left. Defendant returned to the bathroom. Reminded again that her employer would return any minute, defendant closed the bathroom door. After a few minutes, Gina R. heard him leave. It was stipulated that a print of defendant's right index finger was lifted from the bathroom door by Fairfield police.

Three days after the Eagle's Video Showcase robbery and rape, on November 27, 1987, around 2:45 p.m., defendant entered another video store, Video International, in Stockton. On that day, the Friday after Thanksgiving, two clerks were on duty, one of them a male, and the store was busy with customers. After about a half hour, defendant left the store. He returned a while later, however, when there were only two or three customers present and the male clerk had completed his shift and left. The remaining employee was Dora S., age 19. After some 15 minutes, when all the customers were gone and Ms. S. was restocking returned videotapes, defendant grabbed her from behind by the neck. "Shut up, bitch," he said, placing his hand over her mouth.

Defendant then walked Ms. S. to the cash register where he took between $250 and $350; he also took a $10 bill from Ms. S.'s pocket. Walking her to a back room, defendant wrapped an extension cord around Ms. S.'s waist, then bound her hands. He then took her into the bathroom and stuffed her mouth with paper towels. After ordering her to sit on the toilet bowl, defendant said "no, never mind, bad idea." Returning to the store's back room, he sat Ms. S. on a stool and began to wrap a large plastic banner the store had used for its grand opening around her head. "Oh, no, never mind," he said. Then, with string taken from the banner, he tied her hands to each other and her feet to the stool. At that point, another customer entered the store. "Hello, hello," she called, "is anyone there?" "We'll be with you in a minute," defendant answered from behind the curtain separating the back room from the front counter. Opening the back door, he stepped outside and disappeared.

In addition to this evidence, the People placed in evidence records from the State of Tennessee showing defendant's prior convictions for burglary, aggravated assault, and escape.

2. *The defense case.*

The penalty phase defense included testimony from defendant's mother, father, two brothers, two of his three sisters, his wife, father-in-law, and a high school sweetheart. The gist of the family members' testimony was that although close, the children had followed their father's taciturn lead, seldom expressing emotion and never discussing personal difficulties. Defendant's father, who spent his career in the Army, was tough and laconic. The family often moved from one army base to another before ending up in Cleveland, Tennessee, where his father worked as an electrician and was away most of every week. The jury also heard testimony from Thomas Tioaquen, formerly the warden at the Bradley County, Tennessee, jail. Tioaquen testified to the

circumstances surrounding a June 1982 jailbreak by defendant and three other men. Defendant was the youngest of the group, Mr. Tioaquen said, and never left the jail unit. He was found hiding under a blanket beneath a bunk, and apologized to Tioaquen for the escape attempt. In Tioaquen's view, a death sentence was not an appropriate penalty in defendant's case.

At the heart of the penalty-phase defense was a reprise and elaboration of the psychiatric and neurological expert testimony offered at the guilt phase. A psychologist trained in the treatment of substance abuse, Dr. Steven Pittel, testified that the daily administration of Tedral, a combination of ephedrine and phenobarbital used to treat bronchial asthma, from the time defendant was an infant until he was 14 years old probably had severe central nervous system effects, including nervousness, lack of concentration, and paranoia. When, following a doctor's suggestion, his parents took him off the drug, Dr. Pittel related, defendant began to "self-medicate," turning to illegal drugs as substitutes for the missing Tedral. Using a combination of alcohol and marijuana at first, defendant later developed a similar addiction to alcohol and crack cocaine. Prolonged use of these drugs, Dr. Pittel testified, eventually led to a state of paranoia accompanied by physical and mental exhaustion.

### 3. *Rebuttal.*

On rebuttal, the People presented the testimony of Nino Pipitone, an employee of the state's Department of Corrections. Mr. Pipitone testified that, based on his experience as a correctional counselor, prisoners serving terms of life without the possibility of parole are sometimes able to achieve changes in classification that permit them to be housed in less than maximum security conditions.

## II. GUILT PHASE ISSUES

### A. *Miranda Claims*

#### 1. *Alleged invalid waiver of Miranda rights.*

On December 10, 1987, three days after Norma Painter's body was found, defendant was questioned by Detectives Robert Bell and Stan Reed of the Sacramento Police Department. In the course of that custodial interview, which took the better part of two hours, defendant made three videotaped statements. The first and third of these statements were made to Detectives Bell and Reed; the second to a Detective Vance of the Solano County Sheriff's Office. In pretrial motions, the defense sought to have all three

statements suppressed on the ground that, in obtaining them, the officers had violated the rule announced in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (hereafter *Miranda*). Because defendant's purported waiver of his *Miranda* rights had been obtained involuntarily, the defense argued, his ensuing confession was invalid and inadmissible at trial.

The trial court granted the motion with respect to defendant's statement to Detective Vance, but held that defendant's *Miranda* waiver preceding the first and third statements—those given to Bell and Reed—was valid and that these statements, amounting in substance to confessions to the attempted murder of Shawn May and the murder of Norma Painter, were not inadmissible at trial on that ground. Audiotapes and a transcript of defendant's first statement to Bell and Reed were presented to the jury at trial and admitted into evidence. ■ In challenging the admission of this evidence, defendant contends Detectives Bell and Reed employed a variety of improper means to coerce his statement. Being involuntary, it should not have been admitted at defendant's trial. We consider these challenges in the order presented.

Defendant first argues that Detectives Bell and Reed led him to believe at the outset of their questioning that he was not a suspect in the murder of Norma Painter. Shortly after their interview with defendant began, the following exchange occurred:

"BELL: Also in regard to that, ah, we don't know much about this case yet. Quite honestly, you know . . . .

"MUSSELWHITE: Yeah.

"BELL: [W]e're still getting into it. And as I told you when we were out there, we've got a lot of people we're going to interview, you're one of many.

"MUSSELWHITE: I. don't know nothing about it.

"BELL: Well, that's great. Well we need to find that out.

"MUSSELWHITE: Yeah.

"BELL: Well, we don't know what you know and what you don't know and so, what we'd like to do is just go ahead and advise you of your rights before we even get started and that way, that there's no problem with any of it. Is that alright with you?"

Defendant asserts that these representations by the two police inspectors were untrue and induced a "false sense of security" that led defendant to waive involuntarily his *Miranda* rights. The difficulty with such an argument on this record is the absence of evidence suggesting that Reed and Bell had indeed lied when they told defendant they "d[id]n't know much about this case yet," were "still getting into it," had "a lot of people we're going to interview, you're one of many," didn't "know what you know and what you don't know," and for that reason, "what we'd like to do is just go ahead and advise you of your rights before we even get started and that way, that there's no problem with any of it."

Defendant points out that at the time of the interview, Reed and Bell had information (e.g., impressions taken from the rental applications tablet, defendant's palm print on the coffee table, witness statements that someone similar in appearance had been in the rental office) strongly suggesting defendant's presence at the Cottonwood Apartments on the day of Mrs. Painter's murder. But although suggestive, this evidence hardly added up to premeditated first degree murder. It certainly did not establish that defendant killed Mrs. Painter, or robbed or burglarized the manager's office. It is not unreasonable therefore to take the statements of Reed and Bell at face value—that they were in the midst of a murder investigation, had leads but were still "getting into" the case, and didn't know what defendant knew except that he had likely been at the Cottonwood Apartments on or near the day of the homicide.

Without that missing factual predicate, defendant's claim of police "trickery" in inducing the waiver of his *Miranda* rights falls. The detectives never affirmatively represented to defendant that he was free of suspicion or that someone else was the focus of their investigation. A waiver of *Miranda* required no more to be valid. (*Colorado* v. *Spring* (1987) 479 U.S. 564, 573 [107 S.Ct. 851, 857, 93 L.Ed.2d 954] [only issue presented by *Miranda* voluntariness claims is whether the suspect's " 'will [was] overborne and his capacity for self-determination critically impaired' because of coercive police conduct"].)

2. *Inducing waiver by improper promises of lenity.*

The second part of defendant's challenge to the validity of his *Miranda* waiver is the claim that it was improperly induced by the detectives' promises of lenient treatment in exchange for defendant's cooperation in the Painter murder investigation. The entire evidence of improper inducement on which defendant relies consists of a statement by Detective Bell, made immediately after the questioning of defendant had begun:

"BELL: I want it. For the record too, that you guys came down voluntarily to, to help us out in the investigation that we made contact at your house.

"MUSSELWHITE: Sure thing.

"BELL: We offered to let you drive down here on your own but you, you know (inaudible) didn't have a car so [you] came down with us, right?

"MUSSELWHITE: Yeah.

"BELL: Okay. I just want to, *I just want to show your degree of coopera- tion.*" (Italics added.)

It is on the basis of this abbreviated exchange—and particularly Detective Bell's italicized comment above—that defendant claims his *Miranda* waiver was improperly induced by promises of lenity. The evidence relied on, however, is too slender to sustain that claim. As the extract from the interrogation set out above shows, Bell did no more than note for the record that defendant and his wife had voluntarily accompanied the detectives to the station house, as a means of "show[ing defendant's] degree of coopera- tion." The whole of Bell's one-sentence statement is nowhere close to the half-hour of "softening-up" of the suspect we disapproved in *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 160 [141 Cal.Rptr. 698, 570 P.2d 1050], on which defendant relies. Nor does it present the concerns that led the Court of Appeal to find an invalid *Miranda* waiver by a juvenile suspect in *In re Shawn D.* (1993) 20 Cal.App.4th 200 [24 Cal.Rptr.2d 395] (*Shawn D.*), another case defendant argues supports his involuntariness claim. There, the Court of Appeal found the juvenile's confession to burglary involuntary because "the police repeatedly suggested that [the juvenile] would be treated more leniently if he confessed." (*Id.* at p. 214.) The defendant was told that his honesty would be noted in the police report and that he would receive more lenient treatment if he "explained" his role in the robbery. The police officers also implied, unlike this case, that if the juvenile confessed to and helped recover the proceeds of the burglary, they would intervene on his behalf with the prosecutor: ". . . I will personally talk to the D.A. or persons who do the juvenile." (*Id.* at p. 215, italics omitted.)

Indeed, the opinion in *Shawn D.* itself distinguishes this case: "[T]his is not a case where there was merely *one isolated instance* in which the police implied that [defendant] would benefit from confessing. Rather, the officer continually raised this theme—from the very beginning of the interroga- tion—to the comments about helping the police get the property back—to the statements about [defendant] being able to see his girlfriend and

baby—to the hypothetical about the bank robber—to [the officer's] statement that, 'Seriously, you help us get the stuff back and I will personally talk to the D.A. or persons who do the juvenile.' The *promise of leniency* in exchange for a confession *permeated the entire interrogation.*" (20 Cal.App.4th at p. 216, italics added.) Not only was Detective Bell's statement—that he wanted the record to show defendant's "degree of cooperation"—too brief and insubstantial to qualify as an inducement, it conveys no suggestion of any benefit in exchange for defendant's "cooperation." If defendant's waiver of his *Miranda* rights was otherwise knowing, intelligent, and voluntary, it was not invalidated by the single comment seized on by defendant under this heading.

### 3. *Misrepresentation of Miranda rights as a "technicality."*

Defendant also argues that his *Miranda* waiver was invalid because Detectives Bell and Reed misrepresented the rights conferred on criminal suspects by the Supreme Court's *Miranda* decision, suggesting they were an unimportant "technicality." That representation, defendant claims, misled him into devaluing the importance of the rights conferred on criminal suspects by the Supreme Court's *Miranda* decision. Had he understood the value of remaining silent during police questioning and of requesting the assistance of an attorney, defendant argues, he would not have waived his *Miranda* rights. We agree with the proposition that evidence of police efforts to trivialize the rights accorded suspects by the *Miranda* decision—by "playing down," for example, or minimizing their legal significance—may under some circumstances suggest a species of prohibited trickery and weighs against a finding that the suspect's waiver was knowing, informed, and intelligent. The evidence here, however—and it is slender—does not approach that standard. The sum and substance of the alleged "misrepresentations" concerning the importance of defendant's *Miranda* rights consists of the following single brief statement, made by Detective Bell immediately before advising defendant of his rights:

"BELL: Well, we don't know what you know and what you don't know and so, what we'd like to do is just go ahead and advise you of your rights before we even get started and that way, that there's no problem with any of it. Is that alright with you?"

Detective Bell's comment was not only required as a matter of constitutional law, but was an accurate statement of the office of the constitutionally derived *Miranda* warning, a "prophylactic" against the danger of inculpatory statements by an uninformed suspect. (*Michigan v. Tucker* (1974) 417 U.S. 433, 446 [94 S.Ct. 2357, 2365, 41 L.Ed.2d 182].) Nor was the form

Detective Bell's comment took objectionable; the required warning need not be given as a "talismanic incantation." (*California* v. *Prysock* (1981) 453 U.S. 355, 359 [101 S.Ct. 2806, 2809, 69 L.Ed.2d 696].) As the trial court found after viewing the videotape of the questioning and hearing the suppression argument of defendant's lawyers, "it is obvious that Mr. Musselwhite knew he was there to discuss the incident that occurred in the apartment house . . . he's placed into a room where he's . . . begun to be questioned by two detectives . . . he certainly would have taken it serious. . . . [¶] . . . He seemed to me to be taking it seriously. . . . [¶] . . . [H]e was aware of all the implications of *Miranda*." Last, of course, nowhere does Bell actually use the word "technicality" or words to that effect.

We agree. Given the brevity, as well as the accuracy, of Detective Bell's statement, the fact that the officers never described the *Miranda* warning as a "technicality" or used similar words, the absence of similar comments during the course of the questioning, defendant's record of police encounters as evidenced by two prior felony convictions, the likelihood he was aware he was a suspect in a murder investigation (an awareness drawn from an unexpected police contact at his apartment and reflected in the several lies he told the officers when he was initially questioned), we conclude the record fails to support defendant's claim that the importance of his *Miranda* rights was misrepresented by the detectives and that he was thereby "tricked" into waiving them.

4. *Refusal to cease police questioning at defendant's request.*

Defendant next contends that his *Miranda* rights were violated when Detectives Bell and Reed refused to cease their questioning after he invoked his right to halt the interrogation. As *Miranda* itself recognized, police officers must cease questioning a suspect who exercises the right to cut off the interrogation. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (*Miranda, supra*, 384 U.S. at pp. 473-474 [86 S.Ct. at p. 1627].) "Whether the suspect has indeed invoked that right, however, is a question of fact to be decided in the light of all the circumstances . . . ." (*People* v. *Hayes* (1985) 38 Cal.3d 780, 784 [214 Cal.Rptr. 652, 699 P.2d 1259].) We have also said that " '[a] desire to halt the interrogation may be indicated in a variety of ways,' " (*id.* at p. 784) and that the words used " 'must be construed in context.' " (*Id.* at pp. 784-785.)

In the context presented here, Detectives Bell and Reed were attempting to determine whether defendant was in the apartment complex where Norma Painter's body was found on the day of her murder. The detective said to

defendant: ". . . Okay, we're talking deadly serious stuff here partner. We're through, we're through bantering around. We're going to have to get down to the facts. Okay. The fact of the matter is, you're going to have to think very clearly right now. You got to think what's best for me. Am I in a bind or what. Now what do these guys know and what don't they know. If they got enough to do me, what's my best thing to do. What's best for me."

To this statement, defendant replied, "I don't know what you, *I don't want to talk about this*. You all are getting me confused. (inaudible) I don't even know what you're all talking about. You're getting[,] you're making me nervous here telling me I done something I ain't done. Kill somebody, come on, give me a break." (Italics added.)

Detective Reed answered: "What we are telling you is that, that we do know . . . you were in that, in the complex, okay? That's all. I mean it's no big deal if you're honest with us. But what makes us suspicious is if you continue to say that you weren't there."

"Walking all over the place," defendant replied, "walking up and down roads."

"Right on, there you go," said Detective Reed. "Okay, do you cut through complexes?"

"Not unless there's a parking lot and I got to get to a plaza or something," defendant answered.

"That's the only time?" Detective Reed asked.

"Yeah," defendant answered.

Reed replied, "Okay, well that's a start. Let's say you cut through the parking lot. Okay."

"I didn't have to," defendant said.

After viewing the videotape of the police interview, the trial court concluded there was no evidence of an attempt by defendant to cut off police questioning: "I don't see any evidence in the way that the defendant was acting or in the way he was responding, that he was asking to end that interview, as far as I was concerned, and when I looked at the tape. So I don't think that's a request to terminate."

We give considerable weight, of course, to such a finding by the trial judge. In this case we agree with it. There are a number of cases in which

this court and the Court of Appeal have reviewed the findings of the trial court that what is claimed, post hoc, to be a suspect's attempt to invoke his *Miranda* right to remain silent and cut off further questioning is something less or other than that. (See, e.g., *People* v. *Davis* (1981) 29 Cal.3d 814, 823-824 [176 Cal.Rptr. 521, 633 P.2d 186] [single statement by defendant during polygraph that he did not want to answer a question was not an assertion of *Miranda* rights]; *People* v. *Jennings* (1988) 46 Cal.3d 963, 977-978 [251 Cal.Rptr. 278, 760 P.2d 475] [defendant's statement, after assailing questioning police officer, that " 'I'm not going to talk'. . . . 'That's it. I shut up' " reflected "only momentary frustration and animosity" toward one of the officers and was not an invocation of his right to remain silent]; *In re Joe R.* (1980) 27 Cal.3d 496, 516 [165 Cal.Rptr. 837, 612 P.2d 927] [in context, defendant's statement, " 'That's all I got to say' " or " 'That's all I want to tell you,' " did not amount to assertion of right to remain silent]; *People* v. *Silva* (1988) 45 Cal.3d 604, 629 [247 Cal.Rptr. 573, 754 P.2d 1070] [defendant's statement, " 'I really don't want to talk about that,' " did not amount to invocation of *Miranda*].) This is another such case.

B. *Fourteenth Amendment Voluntariness Issues*

 1. *Police deception concerning evidence.*

 ■ While Detectives Bell and Reed questioned defendant, police forensics personnel were attempting to lift fingerprints from the body of Norma Painter through the use of lasers. Although it appears the detectives did not have the forensics reports in hand at the time of their interview (which in any event were negative for fingerprints), they nevertheless told defendant that his prints *had* been lifted from the victim's skin, including her neck. These misrepresentations, defendant argues, made his confession the product of a species of coercion. We disagree. ■ Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary. (*People* v. *Thompson* (1990) 50 Cal.3d 134, 167 [266 Cal.Rptr. 309, 785 P.2d 857].)

 Rather, there must be a *proximate* causal connection between the deception or subterfuge and the confession. "A confession is 'obtained' . . . if and only if inducement and statement are linked, as it were, by 'proximate' causation. . . . The requisite causal connection between promise [or deception] and confession must be more than 'but for': causation-in-fact is insufficient." (*People* v. *Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330].) Here, defendant argues, the detectives "made up stories about evidence, including that fingerprints could be taken off skin, and clearly misled [defendant]. This deception must be taken into consideration

in determining whether the confession was voluntary under the totality of the circumstances."

■■■ We agree with the assertion, as far as it goes, that police deception is a factor to be taken into consideration in determining the voluntariness of a confession. Here, however, the circumstances in which the statements were made by the detectives to defendant, as well as the statements themselves, fall short of what is required to make out a case of prejudicial deception. Assuming it is true that current laser technology is incapable of successfully lifting identifiable fingerprints from a corpse, it does not follow that telling a murder suspect in the course of questioning that his prints had been lifted from the neck of the homicide victim "caused" him to confess. The link between inducement and statement in this case, in other words, falls short of being "proximate."

2. *Threats to defendant's wife.*

■■■ Defendant also contends that, during their questioning of him, Detectives Bell and Reed made threats against his wife. The portion of the transcript of the interview on which defendant relies (set out below) comes after he had *already* confessed to murdering Norma Painter.

"MUSSELWHITE: Where's my wife? Still here?

"BELL: I think so. I'll let you talk to her as soon as we get through here, Joe. As soon as we get, you come a long way. You might as well clear it all up."

After providing the detectives with additional details surrounding the Painter murder, defendant said:

"MUSSELWHITE: Got to see my wife first. Man, let me see my wife.

"BELL: Alright. Like I say, well right now, tell me about the video store, Joe.

"MUSSELWHITE: I want to see my wife.

"BELL: Okay. I have only one question, Joe, before I go. I don't understand why you hit the lady in the video store. I mean, was she starting to scream too? There's got to be a reason for it, Joe. You didn't just do it out of cold-blood, what was it?

"MUSSELWHITE: She was trying to get away from me.

"BELL: She was trying to run out the store?

"MUSSELWHITE: No, she was trying to get in the other door cause there was people out front. I want to see my wife.

"BELL: Let me talk, have you concluded?

"MUSSELWHITE: Want to tell . . . .

"BELL: You want to tell her?

"MUSSELWHITE: Yeah.

"BELL: Okay.

"MUSSELWHITE: (Inaudible)

"BELL: He wants to talk to his wife.

(Door opens, Reed returns)

"REED: Sure, no problem.

"BELL: What I going to do, why don't we turn this tape off, let him talk to her.

"REED: Okay."

This exchange, defendant argues, demonstrates that the detectives' refusal to allow him to speak to his wife implied that if he did not confess, they might never release her. "[T]here were implied threats," defendant asserts, "to [his] wife." He was thereby induced to complete his confession to the murder of Norma Painter and to confess to the video store robbery. The trial court rejected a similar argument—casting the exchange between Detective Bell and defendant not as a *threat* to defendant's wife, but as a *reward* to defendant himself for his cooperation. It found that "[i]t was the defendant who asked to speak to his wife . . . . I don't view that as a request to terminate the proceedings. I didn't view that as a request for an attorney or for help. I simply don't think it rises to that level."

Although the trial court focused on the question whether defendant's request to see his wife amounted to an indication that he wanted the questioning to cease, we agree that the exchange equally fails to present a factual basis for a finding that the detectives threatened either defendant or

his wife, offered a reward for his cooperation, or otherwise rendered defendant's waiver of his rights under *Miranda* and his subsequent confession involuntary. Defendant had *already* confessed to killing Norma Painter; it was he who raised the question of seeing his wife, not the detectives. Moreover, nothing in the record suggests that Mrs. Musselwhite was under any official constraint; she appears to have accompanied her husband to the stationhouse and waited there while he underwent questioning. The fact that Detective Bell tied up a couple of loose ends left hanging during previous questioning before acceding to defendant's request to see his wife does not render his statements involuntary. (*People* v. *Howard* (1988) 44 Cal.3d 375, 394 [243 Cal.Rptr. 842, 749 P.2d 279]; *People* v. *Thompson* (1980) 27 Cal.3d 303, 327 [165 Cal.Rptr. 289, 611 P.2d 883]; *In re Shawn D., supra*, 20 Cal.App.4th at pp. 213-214.)

In short, evaluating the circumstances of the police questioning of defendant in its totality, we conclude it falls short of rendering his confession to the murder of Norma Painter involuntary in any constitutionally meaningful sense.

## C. *Denial of Motion to Sever*

Defendant contends the trial court committed reversible error when it refused to grant his pretrial motion to sever the capital counts arising from the Painter murder from the robbery, assault, and attempted murder charges filed in connection with the Video Mart incident that occurred a week earlier. Specifically, defendant argues that the evidence supporting the charges stemming from the video store incident and the injuries to the store clerk, Shawn May, was especially inflammatory, so much so that it prejudiced defendant in the eyes of the jurors when it came to consider the capital murder charge arising out of the killing of Norma Painter. That inflammatory evidence, defendant contends, coupled with the strength of the prosecution's case on the robbery and assault charges, made the trial court's refusal to sever the counts a denial of due process.

Section 954 provides that two or more offenses of the same class *may*, in the discretion of the trial court, be consolidated for trial. Robbery and murder are the same class of crime; both involve a common element of assault on the victim. (*People* v. *Lucky* (1988) 45 Cal.3d 259, 276 [247 Cal.Rptr. 1, 753 P.2d 1052]; cf. *People* v. *Balderas* (1985) 41 Cal.3d 144, 170 [222 Cal.Rptr. 184, 711 P.2d 480].) The threshold requirements for joinder under section 954 were thus met here. That circumstance, however, is not the end of the story. Severance may nevertheless be *constitutionally* required if joinder of the offenses would be so prejudicial that it would deny

a defendant a fair trial. (See, e.g., *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].) And where, as in this case, one of the charged crimes is a capital offense, it is important that a reviewing court "consider the [joined] cases both separately and together in order to fairly assess whether joinder would tend to produce a conviction when one might not be obtainable on the evidence at separate trials." (*Id.* at p. 454; *People* v. *Balderas, supra*, 41 Cal.3d at p. 171.)

■ We review the denial of a motion to sever under an abuse of discretion standard, assessing the trial court's exercise of discretion "in light of the showings *then* made and the facts *then* known. [Citations.]" (*People* v. *Balderas, supra*, 41 Cal.3d at p. 171, italics added.) In *Williams* v. *Superior Court, supra*, 36 Cal.3d at pages 452-454, we described in detail the factors through which the trial court's exercise of discretion is channeled: whether evidence of the crimes to be tried jointly would or would not be cross-admissible; whether some of the charges are unusually likely to inflame the jury against the defendant; whether the prosecution has joined a weak case with a strong case (or with another weak case), so that a "spillover" effect from the aggregate evidence on the combined charges might alter the outcome as to one; and whether any of the joined charges carries the death penalty. (See also *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 135 [172 Cal.Rptr. 86]; *People* v. *Davis* (1995) 10 Cal.4th 463, 508 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *Frank* v. *Superior Court* (1989) 48 Cal.3d 632, 639 [257 Cal.Rptr. 550, 770 P.2d 1119]; *People* v. *Balderas, supra*, 41 Cal.3d at pp. 171-173.) The burden of demonstrating an abuse of discretion rests with the party seeking severance—here defendant—who must " 'clearly establish' " a " 'substantial danger of prejudice requiring that the charges be separately tried.' " (*People* v. *Davis, supra*, 10 Cal.4th at p. 508; *People* v. *Balderas, supra*, 41 Cal.3d at p. 171.)

At the hearing on defendant's motion to sever the counts, Judge Ridgeway expressed what he called a "gut reaction" that the evidence was not cross-admissible. He found, however, that while cross-admissibility "is one factor the Court should definitely consider, it is not controlling." That was also true, the trial court found, with respect to the capital nature of the Painter murder count. "Granted, it's a capital—one's a capital case and one is a non-capital case, but that doesn't seem to be that controlling when I view the cases . . . ." ■ To the trial judge, the decisive considerations against severance were the other two factors—whether the evidence supporting one of the charges was unusually inflammatory, and whether the prosecution had joined a weak case with a strong one. "I don't view this as a weak versus strong case, at least based on what I've seen and heard so far," he stated. Nor did the court regard the evidence on the video store robbery counts as

especially inflammatory, at least when viewed in light of recent case law from this court affirming denials of requests for severance.

It is true the photographic evidence of Shawn May's injuries was gruesome, but no more so than the photographs of Norma Painter's body after she had been fatally beaten, strangled and stabbed. We cannot conclude that the evidence in the robbery, assault, and attempted murder case was more lurid and inflammatory than similar evidence in the murder case. The same is true of defendant's claim that Shawn May's eyewitness identification was especially prejudicial in the sense it amounted to the joinder of a strong case with a weak one. Defendant had given a confession to the murder of Norma Painter, the People would seek its admission into evidence at trial, and the defense would acknowledge that defendant was the killer. Shawn May's eyewitness identification of defendant would thus have added little to an already very substantial, indeed overwhelming prosecution case, one that included fingerprints and testimony placing defendant at the model apartment minutes before Painter was murdered.

In any event, error in denying severance could not have prejudiced defendant, given his defense as it unfolded at trial. In its case-in-chief, the defense called a psychiatrist to present expert testimony designed to establish the existence of a brain disorder and its effect on defendant's conduct, including the killing of Norma Painter. As part of that testimony, defense counsel elicited from the witness—Dr. Rosenthal—a detailed account of defendant's criminal history, up to and including the "spree" of felonies committed in the two weeks culminating in the Painter murder: an escalating abuse of crack cocaine, the robbery and assault on Shawn May at the video store, two other video store robberies, one involving a rape, and, last, the murder of Norma Painter. Although the direct and cross-examination of Dr. Rosenthal did not explore, fully and directly, the identical details presented by Shawn May's testimony, it touched repeatedly on the extent to which defendant's conduct revealed a capacity to deliberate or its absence. Given that line of inquiry, evidence supporting the robbery and assault charge could have been, and to some extent was, properly admitted into evidence on the capital murder charge.

We also conclude, albeit in hindsight, that the evidence supporting the video store robbery would in all likelihood have been admissible at the trial of the capital murder charge, given the mental defense tendered by defendant and the manner in which it was presented to the jury. As noted, the defense to the capital murder charge was defendant's claim that he suffered from a functional brain disorder which caused him to kill on impulse and without deliberation. The detailed testimony of Shawn May describing defendant's

conduct at the video store—recounted in part above (*ante*, at pp. 1227-1228.)—impaired the credibility of that defense. May testified that after entering the video store, defendant browsed through the tapes until the two were alone. After furtively dropping a dollar bill on the floor, defendant denied it was his, leading May to open the cash drawer. Then, knife in hand, he assaulted May, forcing her to lock the store entrance. He then diverted any suspicion that might have been aroused by an unanswered ringing telephone, taking the call himself and devising an intelligent, on-the-spot deception.

The ensuing escape plan defendant then executed also displayed intelligent planning and improvisational resourcefulness. The Attorney General's brief aptly sums up the likely effect of this evidence on the jury in resolving defendant's claim that he was afflicted with a mental disorder that made him incapable of deliberation and that he killed on impulse: "This evidence demonstrated planning, weighing of alternatives, imagination, sophisticated deception, role playing, and response to the situation as it developed. These are all indicators, one week before the murder, of a lack of the extensive brain damage [defendant] was trying to establish . . . . [I]t would have been highly relevant on rebuttal."

To this line of reasoning, defendant responds that, had his pretrial motion to sever the Painter from the Shawn May counts been granted, the tactical situation facing the defense would have been changed significantly. Indeed, it might even have led, defendant argues, to a decision by the defense to forego altogether the mental defense it actually adopted in the aftermath of the trial court's denial of the motion to sever. Evaluating the merits of the trial court's exercise of discretion *retrospectively*, however—in light of what occurred at the trial on the joined counts—is inconsistent with our statement in *People* v. *Balderas, supra*, 41 Cal.3d at page 171, that we review the trial court's disposition of a motion to sever in light of the circumstances known to the trial court *at the time it ruled*. Rejecting a similar post hoc claim by Balderas that the trial court had erred by denying a pretrial severance motion, we said that "[w]e cannot accept defendant's argument, since it depends on events which occurred at trial and would not necessarily have been apparent at the time the issues of severance . . . were decided." (*Id.* at p. 172.) Although defendant's argument here is the obverse of the defendant's argument in *Balderas*, the operating principle is identical: On review, the merits of the severance motion must be assessed from the perspective of the trial court at the time it ruled, rather than in light of subsequent events at trial.

Defendant makes a final claim, pendent to the severance issue, that given the possibility of a prejudicial spillover from those counts to the capital

charge, the trial court should have given an instruction limiting the use the jury could make of the video store robbery evidence to those three related counts. Because that evidence was highly relevant to defendant's defense to the capital murder charge, however, it would have been error of constitutional magnitude had the jury been instructed that it could not consider the video store robbery and assault evidence as it bore on defendant's mental state defense. And, again, given the nature of the defense, the details of the video store robbery were not "prejudicial" in the sense in which that word is used in this context: They were not the sort of factual details " ' "uniquely tend[ing] to evoke an emotional bias . . . which has very little effect on the issues." ' " (*People* v. *Garceau* (1993) 6 Cal.4th 140, 178 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Instead, the evidence was material to defendant's claim that he lacked the capacity to deliberate.

## D. *Refusal to Give Defendant's Pinpoint Instruction on Mental Disorder*

At the guilt phase instructions conference, defense counsel requested that the court give the jury the following special instruction: "If the evidence shows that the defendant was suffering from a mental disturbance, mental disorder or mental dysfunction at the time of the alleged offense, the jury should consider this evidence in determining whether the defendant engaged in premeditation or deliberation, as those terms have been defined for you, or harbored malice aforethought. [¶] If from all the evidence, you have reasonable doubt whether defendant formed those mental states you must give the defendant the benefit of the doubt and find he did not have such mental state."

The trial court declined to give defendant's proposed special instruction. Instead, it read to the jury the following instruction, the text of which had been agreed upon by both the prosecutor and defendant's attorneys: "Evidence has been received regarding a mental disease, mental defect, or mental disorder of the defendant at the time of the crime charged in the Information. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crimes charged in Counts One and Seven, to wit, murder and attempted murder."

Relying upon our opinions in *People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847] and *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 885 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845], defendant argues that because his proposed instruction "pinpointed" the crux of his defense and related the reasonable doubt standard of proof to particular elements of the offenses charged, he was entitled to have it given to the

jury. Moreover, he argues, the instruction actually given by the trial court was flawed: Counts 1 and 7 of the information charged defendant with murder of the first degree (count 1) and nonpremeditated attempted murder (count 7), that is, attempted murder with malice aforethought only. Because the only mental element common to both of these offenses was malice aforethought, defendant's argument runs, a conscientious jury could well have reasoned, in light of the specific instruction given, that it could consider the evidence of defendant's mental state *only* to negate his capacity for malice.

The specific prejudice resulting from such an incomplete instruction, defendant argues, was that the jurors might have concluded they were barred from relying on evidence of defendant's mental impairment or incapacity to negate the premeditation and deliberation elements of the first degree murder charge. Because defendant's only real defense to count 7 was that his capacity to premeditate and deliberate was substantially impaired by a functional brain disorder compounded by crack cocaine abuse, the practical effect of the trial court's refusal to give defendant's version of the pinpoint instruction was the denial of the opportunity to present his theory of the case, an error that, under the circumstances, violated the Sixth Amendment and was reversible per se.

Considered in their totality, however, the instructions were adequate. As we said in *People* v. *Castillo* (1997) 16 Cal.4th 1009, 1016 [68 Cal.Rptr.2d 648, 945 P.2d 1197], " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (Quoting *People* v. *Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251]; *id.* at p. 539 [" 'The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' "]; see also *People* v. *Chavez* (1985) 39 Cal.3d 823, 830 [218 Cal.Rptr. 49, 705 P.2d 372] ["[W]e must look to the entire charge, rather than merely one part, to determine whether error occurred."]; *People* v. *Noguera* (1992) 4 Cal.4th 599, 630-631 [15 Cal.Rptr.2d 400, 842 P.2d 1160].)

The jury was instructed that "in the crime[] of murder, the necessary mental states are malice aforethought, premeditation, and deliberation. [¶] In the crime of attempt[ed] murder, the necessary mental state is express malice aforethought, namely, a specific intent to kill unlawfully another human being." A mere three paragraphs later, the trial court instructed the jury that "[e]vidence has been received regarding a mental disease, mental defect, or mental disorder of the defendant at the time of the crime charged in the

Information. . . . [¶] . . . You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crimes charged in Counts One and Seven[,] to wit, murder and attempted murder." The instructions also explained to the jury, however, that "[i]f the evidence shows that the defendant was intoxicated by drugs or alcohol at the time of the alleged crime, you should consider that fact in determining whether the defendant had such specific intent or mental state," and that "[i]f from all the evidence you have a reasonable doubt whether the defendant formed such specific intent or mental state, you must find that he did not have such specific intent or mental state."

Finally, in its closing guilt phase argument to the jury, the defense pointed out, "[O]ne of the things that you have to do is look at all the evidence and make a determination for yourself as to whether or not you think the evidence is such that the intoxication and/or mental disease was sufficient at the time that Norma Painter died, that Mr. Musselwhite was unable to even form malice. [¶] . . . And the burden is on the People that they not only have to prove Mr. Musselwhite is guilty, but they have to prove beyond a reasonable doubt that the death, the death of Norma Painter, was not as a result of such disorder."

The jury instructions as a whole, we conclude, adequately informed the jury that it could consider the evidence of defendant's mental disease or defect in deciding whether the People had carried their burden of proving the mental elements of first degree murder beyond a reasonable doubt.

E. *Duty to Instruct Sua Sponte, in Felony-murder Prosecution, on Simultaneity of Killing and Specific Intent to Commit Underlying Felony*

Defendant contends that under the Fifth, Eighth and Fourteenth Amendments of the United States Constitution, the trial court was under a sua sponte duty to instruct the jury that in a capital prosecution based on the felony-murder doctrine, the People are required to prove that the killing and defendant's intent to commit the underlying felony occurred concurrently. As counsel formulates the requirement, even without a request, the jury should have been instructed that "the specific intent required for felony murder (to commit a burglary or robbery) had to exist concurrently with the act (the killing) for [defendant] to be found guilty on that theory." Defendant points out that the trial court gave the jury a similar instruction with respect to the other counts charged. Because the felony-murder doctrine incorporates the specific intent required for the underlying felony, the argument runs, a "concurrent event" instruction was required here.

We conclude that the instructions given the jury taken as a whole adequately covered defendant's point. As read to the jury, CALJIC No. 8.21 required that the killing occur "during the commission or attempted commission of the crime of burglary or robbery," a requirement that in its turn required proof that defendant had the specific intent to commit burglary or robbery. In addition, CALJIC No. 3.31 as read to the jury stated that the crimes of burglary and robbery required that the specific intent to commit those crimes exist during the burglary or robbery. In combination, these instructions, by requiring that the specific intent to burglarize or rob exist during the burglary or robbery, effectively told the jury that the specific intent to burglarize or rob must exist at the time of the killing. There was no instructional error on this score.

### F. *Denial of New Trial Motion Based on Newly Discovered Evidence*

At trial, the mainstay of the defense was the claim that defendant suffered from an organic brain disorder which, in combination with the excessive use of crack cocaine and the prolonged abuse of alcohol, made him incapable of premeditating and deliberating the killing of Norma Painter, the mental state required for a conviction of murder of the first degree. As part of its case, the defense presented expert testimony from two physicians—Drs. Rosenthal and Kowell—that tests of defendant using a BEAM machine substantiated the defense theory of an organic brain disorder.

After the guilt and penalty phases of the trial had been completed, the jury's verdicts returned, and sentence imposed, the defense moved for a new trial on the ground that newly discovered evidence undermined the reliability of the verdicts and pointed to a different result. (See § 1181.) The new evidence consisted of the proffered testimony, in affidavit form, of Dr. Robert Bittle, formerly the medical director of Sierra Vista Hospital and a member of the hospital's medical executive committee. To understand the purported significance of Dr. Bittle's affidavit, an account of the role of the BEAM device and conflicting expert testimony at trial concerning its diagnostic value is needed.

As noted, at trial the defense contended a brain abnormality prevented defendant from premeditating and deliberating his criminal acts. Defendant sought to establish that "mental defense" through the expert testimony of Dr. Kowell, a neurologist, and Dr. Rosenthal, a psychiatrist. Both testified the BEAM machine test results were accurate and reliable and supported the defense claim that defendant suffered from a functional brain disorder. On rebuttal, the People called Dr. Adelberg, a neurologist, who testified that the

BEAM machine test results were not reliable. He based his opinion in part on his experience with a BEAM machine and its test results at Sierra Vista Hospital, where he served as a member of the medical executive committee. According to Dr. Adelberg's testimony, the medical committee of the hospital subsequently recommended that the BEAM device be removed, a recommendation, Dr. Adelberg testified, based on the opinion that the device posed a risk to patient treatment: Its unreliability often led to misdiagnoses and, as a consequence, unnecessary or inappropriate treatment.

It was to counter this testimony of Dr. Adelberg that, on surrebuttal, the defense called Dr. Robert Bittle. A former director of the medical executive committee at Sierra Vista, Bittle testified that BEAM test results *were* reliable. Further, he testified the BEAM machine was removed from Sierra Vista not because of frequent misdiagnoses, but because the medical committee's new director did not support keeping the device: Its high cost compared to its limited utility among Sierra Vista's patient population did not justify its retention. The gist of Dr. Bittle's affidavit in support of defendant's new trial motion was the assertion that, in his testimony at trial, Dr. Adelberg's opinion as to why the BEAM machine was removed from Sierra Vista was not only incorrect, but *known* to Dr. Adelberg to be false at the time he testified; that is, that Adelberg has perjured himself. According to Dr. Bittle's new trial affidavit, the reason the BEAM machine was removed from Sierra Vista Hospital was not the result of misdiagnoses, but financial reasons.

In its bench ruling on defendant's new trial motion, the trial court concluded the Bittle evidence did not qualify as newly discovered: "I think the defense was aware of Dr. Adelberg's testimony. They knew exactly what he was going to testify to, and with proper exercise of diligence they could have . . . foreseen that." In any event, Judge Ridgeway remarked, "I don't think the result would be any different because in my view, their testimony really would be cumulative. There was a disagreement between Dr. Adelberg and Dr. [Rosenthal] . . . . This is a situation where we're talking about credibility, and the jury found Dr. Adelberg's testimony more credible than the defense witness. [¶] Furthermore, I do not think the test results of the BEAM machine were the persuasive factor in this case, given the weight of the prosecution's case. In short, I don't think that the result would have been any different . . . . Accordingly, the motion for new trial based on the Adelberg testimony is denied." That determination lay well within the trial court's discretion, the standard under which we review a trial court's denial of a motion for a new trial under section 1181. Subdivision 8 of that provision authorizes trial judges to order a new trial when "new evidence is discovered material to the defendant, and which he could not, with reasonable diligence,

have discovered and produced at trial." Speaking of this provision in *People* v. *Delgado* (1993) 5 Cal.4th 312 [19 Cal.Rptr.2d 529, 851 P.2d 811], we said the trial court's ruling on such a motion " ' "rests so completely within [its] discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*Id.* at p. 328.) As the trial court noted in denying the defense motion, the testimony of both Dr. Kowell and Dr. Rosenthal conflicted with Dr. Adelberg's. The "new," posttrial evidence proffered by Dr. Bittle's affidavit did little more than reinforce the views of Dr. Rosenthal given in his testimony at trial, an opinion the jury had already heard.

It is true that, as defendant points out, neither Rosenthal nor Kowell testified specifically about the reasons why the BEAM machine was removed from the Sierra Vista Hospital, but that is not quite the point at issue. Dr. Bittle *himself* testified *at trial* for the defense that he "personally [was] not aware of [his] misdiagnosis or misrepresentation in terms of treating patients [at Sierra Vista], as far as the use of the BEAM as a diagnostic tool or technique." This trial testimony thus directly contradicted Dr. Adelberg's testimony. Had misdiagnoses with the BEAM machine come to his attention, it "[u]ndoubtedly" would have been of concern to him. Dr. Bittle testified that "for something to be abused like that would be grossly unacceptable." Moreover, Dr. Bittle testified that he would have been aware of instances of misdiagnosis or mistreatment at Sierra Vista as a result of the BEAM machine.

It is thus clear from the record of the testimony at trial on this point that the opinion of Dr. Bittle differed from that of Dr. Adelberg so far as incidents of misdiagnosis and mistreatment attributable to use of the BEAM machine were concerned. And the jury, of course, heard the testimony of both medical experts. As the trial judge remarked, the jury must have resolved the conflict for itself on credibility grounds: "There was a disagreement between Dr. Adelberg and Dr. [Rosenthal] . . . . This is a situation where we're talking about credibility, and the jury found Dr. Adelberg's testimony more credible than the defense witness." There was no error, we conclude, in the trial court's denial of defendant's motion for a new trial.

### G. *Prosecutorial Misconduct: Presenting False Testimony; Disparaging Defense Witnesses*

#### 1. *False testimony.*

 Related to defendant's claim that the trial court erred in not granting his motion for a new trial on the basis of newly discovered evidence is

the claim that in presenting the testimony of Dr. Adelberg, the prosecution knowingly permitted perjured testimony. We reject this contention for several reasons.

First, although it could have, the defense never raised before the trial court a claim that the prosecution knowingly presented perjured testimony. Given the conflicting nature of the expert medical testimony presented to the jury on the issue, the trial judge was especially well-equipped to resolve the question of perjured expert testimony. By not raising the issue before the trial court in the first instance, defendant has waived it. (See, e.g., *People* v. *Clair* (1992) 2 Cal.4th 629, 662 [7 Cal.Rptr.2d 564, 828 P.2d 705] [no exception in capital cases to general rule that claims of prosecutorial misconduct are waived unless timely raised at trial].) Moreover, in denying the posttrial motion of the defense for a new trial based on Dr. Bittle's assertion that the prosecution's medical expert, Dr. Adelberg, had committed perjury (*ante*, at pp. 1251-1252), the trial judge noted the defense claim that Dr. Adelberg "was either lying under oath or taking it at best that he was mistaken. [¶] I do not find that in his testimony. I do not think that that is an accurate interpretation of his testimony. And I don't think that each time witnesses disagree in a trial that automatically means that they are both lying or that either one of them is lying. . . . [¶] . . . [¶] . . . I don't think the result would be any different because in my view, their testimony really would be cumulative. There was a disagreement between Dr. Adelberg and Dr. [Rosenthal] . . . . This is a situation where we're talking about credibility, and the jury found Dr. Adelberg's testimony more credible than the defense witness."

Second, even if we were to assume that a statement by the prosecution's expert witness *was* shown to be demonstrably false, it does not follow the prosecutor knew about it. Certainly, there is nothing in the record to which defendant can point that demonstrates such knowledge. Third, like the trial judge, we doubt the misconduct alleged by defendant could have been prejudicial on this record. Reading the transcript of this trial, the controversy surrounding the particular BEAM device at Sierra Vista Hospital and the reasons for its removal strike us as being of marginal value to the defense. Dr. Adelberg's objections to the forensic utility of brain mapping went not to the particular device used at Sierra Vista or even to its manufacturer. Rather, it was based on expert opinion regarding the diagnostic value of brain mapping in general and relied in part on a defense document questioning the utility of the technique in a forensic or trial setting. This division of professional opinion among medical experts over the forensic value of brain mapping was ventilated before the jury at trial. It is highly unlikely that, even if the defense had been able to establish its claims of misconduct and perjury, they would have prejudiced defendant.

## 2. *Disparaging defense witnesses.*

 Defendant's other claim of prosecutorial misconduct focuses on statements made during the People's closing argument at the guilt phase of the trial. In that part of his argument seeking to discredit defense expert testimony related to brain mapping and the use of the BEAM machine, the prosecutor made two statements that defendant asserts amounted to prejudicial misconduct. First, the prosecutor twice referred to the BEAM machine as "the Marvel Machine." "Anybody else can do the same thing. Go out and get your own data base and call it the Marvel Machine. Richard Gilmour's [the prosecutor] secret data base BEAM Marvel Machine. [¶] And everything is fine, as long as you trust that the data base is good."

The prosecutor's reference to the BEAM machine as a "marvel machine" was based on the testimony of Dr. Adelberg, one of the People's medical experts. In the course of his direct testimony, Dr. Adelberg stated that his most "serious concern" about the specific device used to test defendant—the Nicolet version of the BEAM machine—was that it "prints out interpretations based on secret data." He elaborated: "The BEAM machine made by Nicolet differs from other types of brain mapping in that it contains a built-in test interpreter." "That computerized function" of the Nicolet device, Adelberg continued, "is based on secret data. We have no secret data in medicine. We have no secrets in any scientific basis for any clinical medicine. And any sorts of conclusions based on secrets are, to my way of thinking, outside of medicine . . . ." It was on the basis of that testimony that the prosecutor called the BEAM device used to test defendant a "marvel machine." "The trouble with this BEAM machine is not electronic mapping, it's that this particular entrepreneur . . . made his own version of electronic mapping and computerized it. [¶] Anybody else can do the same thing. Go out and get your own data base and call it the Marvel Machine. Richard Gilmour's secret data base BEAM Marvel Machine. [¶] And everything is fine, as long as you trust that the data base is good." In context, the prosecutor's characterization was fair comment and a legitimate critique of the defense evidence on the point. It was not misconduct.

The same is true of what defendant calls the prosecution's "belittling" of defense experts. The prosecutor did suggest to the jury in his closing argument that Dr. Bittle, a defense expert on the brain mapping issue, was biased because he had a financial interest in the BEAM machine. It appears from his own testimony, however, that along with Ms. Schade, Dr. Bittle in fact did have a one-fifth ownership interest in the mapping device. Both were part owners of the Sacramento neurodiagnostic laboratory whose chief physical asset is a BEAM machine.

## H. *Constitutional Inadequacy of Trial Counsel*

 Defendant argues that in the presentation of his mental defense at trial, his lawyers fell below the standard of competency prescribed by the Sixth Amendment, an error that had prejudicial (and thus reversible) consequences. As noted elsewhere, the central feature of that defense was the claim that defendant suffered from an organic brain defect that, in conjunction with prolonged crack cocaine abuse, rendered him incapable of the deliberation and premeditation required to support a verdict of first degree murder. In seeking to lay a factual anchor for that defense, defendant's counsel presented expert psychiatric testimony designed to illustrate for the jury the random, impulsive, and unpremeditated quality of defendant's behavior, especially in the two or so weeks immediately preceding the killing of Norma Painter.

As the defense opened its case-in-chief at the guilt phase, the jury heard testimony from Dr. Fred Rosenthal, a psychiatrist who had conducted extensive interviews with defendant and studied his history of multiple drug use and its effect on his behavior. Soon after defense counsel began his direct examination of Dr. Rosenthal, proceedings were recessed and Judge Ridgeway conferred with counsel for both parties out of the presence of the jury. The prosecutor, Mr. Gilmour, then made a statement for the record:

"MR. GILMOUR: Your Honor, as I indicated previously, I just obtained the doctor's [i.e., Dr. Rosenthal's] report yesterday evening around 4:00 o'clock or so. [¶] And looking at it, I noticed last night that in his report verbally set forth is virtually the entire penalty phase evidence that I had intended to produce and which has been noticed in 190.2. And he sets forth the defendant's background in robbing three stores, one in Fairfield, one in Stockton, of course, the one we have in Sacramento. [¶] He talks about raping the woman in Fairfield and talks about the fact that he's been in prison in Tennessee, and for burglary and escape and virtually the whole thing. [¶] Naturally, when I read this, is this [a] legitimate area for cross-examination, whether they bring it up or not, but not to worry because Mr. Dawson [defense counsel], as a matter of fact, reminded me that I should have brought it to the court's attention. [¶] In essence, and he said that over the break he does plan on bringing this out with this doctor, and he intends to do that. And I don't know that it's necessary that the defendant—that there be any kind of waiver, but out of an abundance of caution, I want to bring it to the Court's attention to see if it's necessary, in the Court's opinion, that the defendant be aware of this and, in essence, consent and agree that this is what is in his best interest to do. [¶] Because otherwise, I don't think—I don't even think even if it's in the report, if they don't talk about, I don't think I'd be able to go into it on cross.

"THE COURT: Well, this is a little unusual. I've never been confronted with the prosecutor bringing this up. [¶] Mr. Dawson, I'm not sure whether to ask you to comment or not, but this is a little unusual in that sense that the prosecutor has brought it to the attention of the Court. [¶] Do you care to comment on this at all?

"MR. DAWSON: No.

"THE COURT: I take it that if you are going to go into it, that you have weighed the advantages and disadvantages in bringing it up at this time, however?

"MR. DAWSON: Well, I'm simply going to say, your Honor, that there have been long hours of evaluation on the part of both Ms. Lange [cocounsel] and myself as to this kind of tactical issue, and I guess we're at the point where if our bar tickets go because of this, that's the way it works.

"THE COURT: I know you also have a problem because if you—if you wait and the jury hears all this stuff in the penalty trial, it can sometimes have a devastating effect, and bringing it up now allows to reduce the shock value, and that's one tactical reason. [¶] But I take it Mr. Musselwhite's been apprised of this and is not uneasy with it?

"MR. DAWSON: I think he's uneasy with the entire process.

"THE COURT: Well, I thought that's a poor choice of words.

"MR. DAWSON: Yes. Let's put it this way. It may also be a fundamental part of the ultimate issues that the doctor is going to have to talk about, and to maintain the integrity of the evaluation, that puts us at that tactical point. We're caught between the devil and the deep blue, as it were.

"THE COURT: I can understand your dilemma. [¶] Mr. Musselwhite, you have [an] absolute right not to comment or to say anything at all, sir. And if you want to say something, you have every right to do so, but you certainly are not required to say anything at all, and it might be in your best interest to at least take a brief moment and talk to your lawyers for just a second as to whether or not you want to do anything at all at this point.

"THE DEFENDANT: Well, we've discussed this—

"THE COURT: Before you do so, why don't you talk to them.

(Unreported discussion between Ms. Lange, Mr. Dawson, and the defendant.)

"THE DEFENDANT: Your Honor, we've discussed this in the past, you know, quite a few times. And I agree one hundred percent what they are doing, and I'm willing to let it go."

The direct examination of Dr. Rosenthal then resumed. In the course of questioning, the witness's testimony encompassed the content of his four interviews with defendant, his examination of the BEAM test results, and interviews with people acquainted with defendant. As part of that psychiatric evaluation, defense counsel had provided Dr. Rosenthal with reports of four criminal incidents involving defendant in the two weeks immediately prior to the killing of Norma Painter: a robbery and rape at a video store in Fairfield on November 24, 1987; the robbery of a store in Stockton on November 27, 1987; the Sacramento video store robbery on November 30, 1987, as a result of which defendant was also charged with the attempted murder of Shawn May; and the robbery and murder of Norma Painter on December 7, 1987.

According to Dr. Rosenthal's testimony on direct examination, his conclusion that defendant did not deliberate the murder of Mrs. Painter was based in part on "the history that led up to the time when these crimes occurred, the recent period, specifically a month or two before the killing of the one lady that was killed in this crime." Dr. Rosenthal discerned "quite a tragic escalation [in defendant's drug use and behavior] that seemed to occur up to the point where Mrs. Painter was actually killed in December of 1987." He went on to describe the dynamics of defendant's behavior in the two weeks preceding the killing: "It appeared from the history that Mr. Musselwhite was becoming extremely and increasingly disturbed and was spending more and more time using and searching for the drug that he was using, cocaine. [¶] And his behavior was becoming more destructive. He was becoming more irritable, more hyperactive, more aggressive, and more violent. And there were then episodes within a month of the killing of increasing violence and serious violence that he was engaged in."

"[MR. DAWSON:] And when you talk about episodes, you're aware of the charges that he faces here in terms of the homicide involving Norma Painter and the attempted murder charge involving Shawn May, are you not, sir?"

"[DR. ROSENTHAL:] Yes, I am.

"[MR. DAWSON:] Are you referring to just those episodes of activity, or are you referring to also others?

"[DR. ROSENTHAL:] My understanding is that there were two other episodes just roughly within that same time frame, all occurring within about

two or three weeks of the actual killing, in which Mr. Musselwhite was involved in aggressive acts, stealing or attempting to steal, and attacking people with a weapon.

"[MR. DAWSON:] Now, is this—is the conduct in those acts in the nature of the aggressive or assaultive behavior significant in terms of the understanding you have about conduct of people who are cocaine users?

"[DR. ROSENTHAL:] It's very significant because it's, unfortunately, very typical of people who get involved in extensive cocaine use. Their behavior becomes increasingly destructive, [and] they become more desperate to obtain the drugs."

After elaborating somewhat on the four attacks by defendant between November 24 and December 7, 1987, Dr. Rosenthal continued:

"Clearly, his life, before reaching Sacramento, was not exemplary, but this kind of serious violence did not occur, as far as I could tell from the history. And now in a period of three weeks, as he's using this drug, he starts to become increasing[ly] violent, aggressive, and irrational in a sense, doing acts that are fairly destructive, both to others and to himself. And this, of course, then culminates in this very, very unfortunate tragedy of actually killing someone.

"[MR. DAWSON:] Now, from the standpoint of a mental health professional, someone who's been asked to make an evaluation related to really two incidents, do you feel you could ignore those other incidents, or do those have to be taken into account in evaluating this course of conduct?

"[DR. ROSENTHAL:] I think you cannot ignore the history, especially since it occurred so close to the time that these two episodes that we're concerned with here did occur. [¶] I think as a mental health professional trying to understand the mental state or give some opinion about a mental state, you would have to consider the behavior leading up to those two incidents."

In view of these exchanges, it is not surprising that defendant should now argue before this court that the revelations disclosed to the jury in the course of defense counsel's direct examination of Dr. Rosenthal—particularly the two uncharged prior robberies—were irreversibly prejudicial and constituted inadequate assistance of counsel in the constitutional, Sixth Amendment sense. Although it is clear enough from the trial transcript excerpt, set out above, that trial counsel were cognizant of the risks inherent in the strategy they adopted, defendant suggests alternative, less damaging means of presenting and supporting his mental defense at trial were available and should have been used.

First, he argues that Dr. Rosenthal's testimony would have been equally valid without mention or consideration of the two uncharged prior robberies. Part of the difficulty with this line of attack is that it was refuted, or at least rejected on professional grounds, by Dr. Rosenthal himself during his direct examination by defense counsel. In response to counsel's query whether, as a mental health professional, he "could ignore those other incidents"— meaning the two prior uncharged crimes—in formulating an opinion regarding defendant's mental condition, he answered, "[Y]ou cannot ignore the history, especially since it occurred so close to the time that these two episodes that we're concerned with here did occur. [¶] I think as a mental health professional trying to understand the mental state or give some opinion about a mental state, you would have to consider the behavior leading up to those two incidents."

Defendant's brief counters these views of Dr. Rosenthal, arguing that in preparing his testimony, trial counsel should have instructed the witness not to rely on or mention the unadjudicated prior criminal acts in forming an opinion concerning defendant's deliberative capacity. In pretrial motions, defendant points out, the defense had moved to exclude the introduction by the People of any evidence of these uncharged crimes—the Fairfield and Stockton robberies and attempted rape incidents of November. As the trial unfolded, the prosecution, having succeeded in gaining a favorable ruling on the admissibility of defendant's confession to Detectives Bell and Reed, offered a stipulation that the uncharged offenses would not be raised without advance approval by Judge Ridgeway. With the prosecution's offer to stipulate on the table, the trial court ruled orally before all counsel that "there's to be no mention in this trial by anyone of the Fairfield/ Stockton incidents without bringing it to the attention of the Court . . . ." Thus, as trial was about to begin, the defense had succeeded in barring the prosecution from eliciting any evidence of the two unadjudicated incidents without the express approval of Judge Ridgeway.

As we have seen, however, it was the defense itself—with the trial court's consent—that reversed course and elected to present to the jury evidence of the Fairfield and Stockton crimes. In the face of this record, we have no doubt that decision was an informed, deliberate tactical election, taken by experienced lawyers in the light of the circumstances as they appeared at the time. Is that conclusion alone sufficient to dispose of defendant's Sixth Amendment claim in this direct appeal from the judgment of death? Under the circumstances shown here, we think it is.

We have often said that a reviewing court may not retrospectively second-guess defense counsel's tactical decisions made in the stress of

trial. Indeed, relying on United State Supreme Court precedent, we recently "explained that, '[i]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because "his representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 . . . .) Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citations.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations.]' " (*In re Avena* (1996) 12 Cal.4th 694, 721 [49 Cal.Rptr.2d 413, 909 P.2d 1017]; see also *People* v. *Castillo, supra,* 16 Cal.4th at pp. 1014-1015.) Defendant argues, however, that under the circumstances here counsel's decision to, in effect, jettison the gains obtained through the prosecution's stipulation—by the calculated disclosure to the jury of the two priors in the course of examining Dr. Rosenthal—was all the more egregious, unjustifiable, and prejudicial.

Facial egregiousness, however, is not the test under the Sixth Amendment, nor could it be. Claims of constitutional inadequacy of counsel are assessed under a two-part standard requiring, first, a showing that counsel's performance fell below an objective professional standard and, second, that it prejudiced the defendant. Indeed, in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal,* competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. (*People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1252 [278 Cal.Rptr. 640, 805 P.2d 899].) We cannot say that standard has been met on this record, where seasoned defense lawyers possessed an informed understanding of both the relevant legal principles and the factual and strategic circumstances.

The opinion in *People* v. *Perez* (1978) 83 Cal.App.3d 718 [148 Cal.Rptr. 90], on which defendant relies, is not helpful. There, defense counsel disclosed to the jury the fact of the defendant's prior similar conviction—sua sponte and in violation of the trial court's ban on such a disclosure—because he misunderstood controlling law governing the admissibility of closely similar prior offenses. (*Id.* at p. 733.) Trial counsel in *Perez* had not only blundered, but the record demonstrated affirmatively that the blunder arose because he was ignorant or misinformed as to the governing law. (*Ibid.*) Here, on the other hand, it is evident from trial counsel's colloquy with Judge Ridgeway and the prosecutor that preceded the direct examination of Dr. Rosenthal, as well as from counsel's questions themselves, that defendant's attorney had embarked on an informed if calculated risk.

It is not difficult to see why trial counsel concluded the gamble was worth running despite the obvious hazards it presented. At that juncture, the trial court had ruled there had been no *Miranda* violation in obtaining defendant's confession to the murder of Norma Painter, paving the way for its introduction into evidence at trial. The court had, moreover, denied the defense motion to sever the Shawn May robbery and attempted murder counts from the Painter felony-murder counts. Thus, on the eve of trial, the defense occupied an exposed position—"between the devil and the deep blue," as defense counsel told Judge Ridgeway. In effect, as defendant's attorneys prepared to mount his defense, the possibility of an acquittal appeared vanishingly remote, if not nil, while on the other hand, the chances of a "worst case" outcome—imposition of the death penalty—seemed substantially enhanced. Moreover, since the defense conceded defendant's responsibility for the killing from the outset, avoiding a conviction of first degree murder was his only real hope. That depended, of course, on Dr. Rosenthal making the best possible case for the absence of premeditation and deliberation. Evidently, the defense gambled. And lost.

We conclude, however, that counsel's tactical decision to elicit defendant's uncharged prior crimes and the facts surrounding their commission during the direct examination of Dr. Rosenthal was not unreasonable under the legal and factual circumstances confronting the defense at that juncture in the trial. Counsel's examination of Dr. Rosenthal therefore did not constitute ineffective assistance of counsel within the meaning of the Sixth Amendment.

## I. *Dewberry Error: Attempted Murder and the Benefit of Reasonable Doubt*

Defendant contends the trial court prejudicially erred when it failed to instruct the jury, sua sponte, that if it had a reasonable doubt whether defendant attempted to murder Shawn May, but believed he assaulted her with a deadly weapon, they should give defendant "the benefit of the doubt" and find him guilty of the lesser offense of assault with a deadly weapon. That instructional omission was especially prejudicial, defendant argues, because the trial court *did* give the jury two similar "benefit of the doubt" instructions—with respect to first and second degree murder and with respect to murder and manslaughter (both as to the Painter homicide). Because the jury was told to give defendant the benefit of any reasonable doubt it might have with respect to these offenses but not with respect to the attempted murder of Shawn May and the lesser included offense of assault with a deadly weapon, defendant argues the jurors were left with the erroneous implication that as to that latter count, the benefit of the doubt rule did not apply.

Defendant relies on our opinion in *People* v. *Dewberry* (1951) 51 Cal.2d 548 [334 P.2d 852], in support of his argument. That was a murder case in which the trial court instructed the jury on the elements of murder and manslaughter, explained that there were two degrees of murder and that, if the jury decided defendant had committed murder but had a reasonable doubt as to the degree, "they should give defendant the benefit of the doubt and find him guilty of second degree murder." (*Id.* at p. 554.) Although the *Dewberry* jury also was instructed that if it had a reasonable doubt whether the killing was manslaughter or justifiable homicide, it was to acquit, the trial court refused a *general* defense instruction that would have told the jury that if it found the defendant " 'was guilty of an offense included within the charge . . . , but entertain a reasonable doubt as to the degree of the crime of which he is guilty, it is your duty to convict him only of the lesser offense.' " (*Ibid.*)

We reversed the jury's ensuing conviction of Dewberry of second degree murder on the ground that a criminal defendant is entitled to the benefit of a jury's reasonable doubt with respect to *all* crimes with lesser degrees or related or included offenses. (*People* v. *Dewberry, supra,* 51 Cal.2d at p. 556.) The "failure of the trial court to instruct on the effect of a reasonable doubt as between any of the included offenses, when it had instructed as to the effect of such doubt as between the two highest offenses, and as between the lowest offense and justifiable homicide, left the instructions with the clearly erroneous implication that the rule requiring a finding of guilt of the lesser offense applied only as between first and second degree murder." (*Id.* at p. 557.) Defendant's case is different. Here, the trial court *did* give the jury several generally applicable instructions governing its use of the reasonable doubt standard. All redounded to defendant's benefit in the sense that each required the jury, where it had a reasonable doubt as to *any included or related offenses or degrees*, to find defendant guilty of the lesser included or related offense or lesser degree, that is, to give defendant the benefit of any reasonable doubts it may have had. Granted, the trial court gave *specific* reasonable doubt benefit instructions only with respect to first and second degree murder (CALJIC No. 8.71) and murder and manslaughter (CALJIC No. 8.72), and did not give such a specific instruction with respect to attempted murder and assault with a deadly weapon.

But that omission alone does not place this case within *Dewberry*'s orbit. A jury instructed that it must give a defendant charged with murder the benefit of any doubt with respect to first and second degree murder but not instructed to that effect generally is obviously different from a jury instructed with respect to the degrees of murder *and* instructed as the jury was here: "[I]f the evidence as to any such specific intent or mental state is

susceptible of two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to the absence of the specific intent or mental state, you must adopt that interpretation which points to the absence of the specific intent or mental state." In effect, the jury instruction just quoted fulfilled the same function as the instruction proffered by the defendant in *People* v. *Dewberry, supra*, 51 Cal.2d at page 554, and erroneously refused by the trial court in that case. There was no instructional error on this score at defendant's trial.

### J. Failure to Instruct That Corpus Delicti of Special Circumstances Must Be Established Independently of Defendant's Extrajudicial Statements

Defendant also contends the trial court erred by failing to instruct the jury sua sponte that the corpus delicti of the special circumstances must be established independently of a defendant's extrajudicial statements.[1] He argues that apart from his statements made during questioning by Detectives Bell and Reed, "there was no evidence when, if ever, [defendant] formed the intent to rob Painter, or to steal property from the office. Thus, absent [defendant's] statement, there was no evidence that a burglary or a robbery was intended prior to the killing." Defendant is correct in his implicit assertion that establishing the felony-murder special circumstances includes showing the intent to commit the underlying felony precedes the killing. For, as Witkin and Epstein have it, "if the intent to rob or burglarize is not formed until after the attack on the victim, the killing cannot be considered to be in the perpetration of robbery or burglary." (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 472, p. 531.) It does not follow, however, that the requirement that the intent to commit the underlying felony precede the killing means that proof of the corpus delicti of the special circumstances encompasses proof the killing occurred in the commission of the underlying felony.

Although superficially similar, the question here is distinct from the one we considered above. (*Ante*, at pp. 1249-1250.) There, we rejected defendant's claim that the jury should have been instructed sua sponte that "the specific intent required for felony murder (to commit a burglary or robbery) had to exist concurrently with the act (the killing) for [defendant] to be

---

[1] Proposition 115, an initiative approved by the voters on June 5, 1990, enacted section 190.41, providing that " 'the corpus delicti of a felony-based special circumstance enumerated in paragraph (17) of subdivision (a) of Section 190.2 need not be proved independently of a defendant's extrajudicial statement.' " We have held section 190.41 applies only to crimes committed after its effective date. (*People* v. *Zapien* (1993) 4 Cal.4th 929, 985, fn. 7 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *People* v. *Mickle* (1991) 54 Cal.3d 140, 179, fn. 22 [284 Cal.Rptr. 511, 814 P.2d 290]; *Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 297-299 [279 Cal.Rptr. 592, 807 P.2d 434].)

found guilty on that theory." The issue here is a little different. It is whether, as defendant's argument implicitly suggests, the corpus delicti rule as applied to the felony-murder special circumstances alleged requires independent proof that *the killing* occurred in the commission of the underlying felony, and not just independent proof of the corpus delicti of the underlying felony. We expressly reject defendant's contention.

In *People* v. *Mattson* (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887], we concluded that "the corpus delicti of felony-based special circumstances must be established independently of an accused's extrajudicial statements." (*Id.* at p. 94.) We reached that conclusion on the basis of former section 190.4, subdivision (a), requiring that the underlying felony "be charged and proved pursuant to the general law applying to the trial and conviction of the crime." Proving the underlying felony "pursuant to the general law," we reasoned in *Mattson*, included satisfying the corpus delicti rule with respect to the felony charged. (37 Cal.3d at p. 94.) It follows from the logic of our analysis in *Mattson* that the corpus delicti rule in the case of felony-murder special circumstances applies *only* to the underlying felony itself. The rule does not require independent proof of the *additional* special circumstance element that the killing occur while the defendant was engaged in the commission of the underlying felony. Proof of that element, of course, is not required in order to prove the underlying felony "pursuant to the general law applying to the trial and conviction of the [underlying] crime." All that *Mattson* requires, then, is that the jury apply the corpus delicti rule to the underlying felony.

K. *Error In Failing to Instruct That Malice Aforethought Is an Element of Felony-murder Special Circumstance*

 Defendant next contends the felony-murder special circumstance of section 190.2, subdivision (a)(17) incorporates malice aforethought as an element of that offense. Thus, the jury should have been (but was not) instructed that it was required to find malice. This is ground we have been over before. We reject defendant's argument here for the same reason we rejected the same argument in *People* v. *Visciotti* (1992) 2 Cal.4th 1 [5 Cal.Rptr.2d 495, 825 P.2d 388]. There, the defendant argued that the felony-murder special circumstance required that the murder be committed with express malice, premeditation and deliberation. In language that is dispositive here and merits quoting, we disagreed: "Defendant argues that the failure of the trial court to instruct the jury . . . that a specific intent to kill is a necessary element of a felony-murder special circumstance was error that requires that the felony-murder-robbery special circumstances be set aside. It is not sufficient, he claims, that the jury found, under other proper

instructions, that the murder was intentional because the jury must also find that the murder was committed with express malice, premeditation, and deliberation. [¶] The claim lacks merit. *Carlos* v. *Superior Court* [(1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862],] [on which defendant relied] was reconsidered and overruled in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], in which we held that intent to kill is not necessary if a defendant convicted of first degree murder personally killed the victim. Consequently, *Carlos* applies only to murder committed between December 12, 1983, the date on which *Carlos* was decided, and October 13, 1987, the date on which it was overruled. [Citations.] The jury found on other properly given instructions that defendant personally killed [the victim]. It is also well established that the felony-murder special circumstances (§ 190.2, subd. (a)(17)) are not limited to premeditated and deliberate murders, and that such a requirement is not mandated by the Eighth Amendment or other constitutional considerations. (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 794-795 [248 Cal.Rptr. 126, 755 P.2d 310].)" (*People* v. *Visciotti, supra*, 2 Cal.4th at p. 62.) Defendant's claim fails.

L. *Claim That Felony-murder Special Circumstance Fails to Narrow the Class of Defendants Who Are Death Eligible*

Defendant's last assertion of error at the guilt phase of his trial is the claim that the felony-murder special circumstances under which he was alternatively charged with a capital crime (the other being premeditated murder) fail to meet minimal Eighth Amendment death penalty standards. They neither narrow the class of "death eligible" defendants, defendant argues, nor define a small subclass more deserving of the death penalty than those not so included. Essentially, defendant's argument is that because the special circumstances provision of section 190.2, subdivision (a)(17), making felons convicted of enumerated offenses death eligible, is adventitious (because not necessarily related to an aggravating mental state), it irrationally imposes a capital penalty on those who have not been shown to have had a morally qualifying intent; while making a much larger class of murderers—those who kill with premeditation but not in the commission of a qualifying felony—*not* subject to the death penalty.

The use of the felony-murder rule as a qualifying special circumstance in California's capital jurisprudence has a controverted history. (Compare, e.g., *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], with *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306] [overruling *Carlos*]; see also *People* v. *Coleman* (1988) 46 Cal.3d 749 [251 Cal.Rptr. 83, 759 P.2d 1260].) It is enough to point out that in *People* v. *Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790

P.2d 676] we rejected an argument identical to the one petitioner makes here—"that the felony-murder special circumstance does not provide the 'meaningful basis [required by the Eighth Amendment] for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not' "—on the ground that "in *People* v. *Anderson, supra,* 43 Cal.3d at page 1147, we squarely rejected that very point." (*Id.* at p. 946.) We do so again in this case.

## III. PENALTY PHASE ISSUES

### A. *Error in Instructions Regarding Aggravating and Mitigating Circumstances*

 Meeting with the prosecutor and trial judge to discuss penalty phase jury instructions, defendant's attorneys sought an instruction to the effect that in selecting a penalty, the jury could consider factors (d) (offense committed under extreme mental or emotional disturbance), (e) (victim was coparticipant or consented to homicidal act), (f) (moral justification or extenuation for defendant's act), (g) (extreme duress or domination by another), and (h) (capacity impaired by mental defect or disease, or intoxication) of the sentencing statute—section 190.3— *only* as factors in mitigation. Counsel also asked for a related instruction that the jury was not to regard the absence of a particular mitigating factor as an aggravating factor. The trial court declined to give the jury the instructions sought by the defense. Instead, it read to the jurors the instructions set forth in CALJIC No. 8.85. Because it failed to explain to the penalty jury *which* of the enumerated statutory factors were aggravating and which were mitigating, the section 190.3-based instruction actually given by the trial court was error, defendant argues, for it "allowed the jury complete discretion to decide whether and for what reason [defendant] should be put to death, since it left them without meaningful and principled guidance." That omission, defendant concludes, rendered the state's capital sentencing scheme arbitrary, capricious and vague.

As we understand defendant's argument, it rests on a misunderstanding of what might be described as the "architecture" of California's death penalty scheme. Contemporary American capital jurisprudence commonly divides the death penalty process into bifurcated phases, often referred to as the eligibility or guilt phase and the selection or penalty phase. (See, e.g., *Tuilaepa* v. *California* (1994) 512 U.S. 967, 971-972 [114 S.Ct. 2630, 2634-2635, 129 L.Ed.2d 750, 759]; *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 470-477 [24 Cal.Rptr.2d 808, 862 P.2d 808]; *Gregg* v. *Georgia* (1976) 428 U.S. 153, 193 [96 S.Ct. 2909, 2394-2395, 49 L.Ed.2d 859]; *Furman* v.

*Georgia* (1972) 408 U.S. 238 [92 S.Ct. 2726, 2743-2744, 33 L.Ed.2d 346].) Although it is constitutionally permissible for a state to provide for the death *eligibility* decision to be made at the penalty selection phase (as Mississippi and Texas, two so-called weighing states, appear to do), California's capital scheme allocates that narrowing function to the antecedent guilt phase. It is there that the jury decides whether a defendant charged with a capital crime is a death eligible murderer.

The California capital scheme accomplishes this narrowing classification at the guilt phase through the jury's determination whether the charge of first degree murder and the qualifying special circumstance alleged by the People are, respectively, proven and true. If the jury so finds, the case proceeds to the penalty selection phase. But the office of that latter segment of a bifurcated capital trial has no role in the required narrowing or death-qualifying function mandated by the Eighth Amendment. That culling process has already occurred in the guilt phase with the jury's finding that the special circumstance alleged is true and the charge of first degree murder proven beyond a reasonable doubt. Or, as we explained in *People* v. *Bacigalupo, supra*, 6 Cal.4th 457, "[t]he 'narrowing' aspect of a state's death penalty law that defines the conduct that brings a defendant within the class of persons subject to the death penalty must, to comport with the Eighth Amendment, include 'some narrowing principle' so as to limit the members of that class. [Citations.] But, when a capital punishment statute adequately narrows the class of death-eligible murderers, the Eighth Amendment does not require a further round of 'narrowing' at the sentence selection stage." (6 Cal.4th at p. 475.)

Partly for that reason, the focus of the penalty selection phase of a capital trial is more normative and less factual than the guilt phase. The penalty jury's principal task is the moral endeavor of deciding whether the death sentence should be imposed on a defendant who has already been determined to be "death eligible" as a result of the findings and verdict reached at the guilt phase. In such a penalty selection undertaking, the Eighth Amendment's strictures are less rigid, more open-ended than the narrowing function of the capital sentencing scheme that has already occurred. It is in light of this bifurcated schema and its differing objectives that defendant's claim under this rubric appears misplaced. The gist of defendant's argument—that the trial court's penalty phase instructions failed to guide the jury in reaching a penalty decision, allowing it "complete discretion"—is correct. But as this court and the United States Supreme Court have pointed out, with respect to the process of selecting from among that class those defendants who will actually be sentenced to death, "[w]hat is important . . . is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." (*Zant* v. *Stephens* (1983) 462 U.S. 862, 879 [103

S.Ct. 2733, 2743-2744, 77 L.Ed.2d 235].) It is not a mechanical finding of facts that resolves the penalty decision, " ' "but . . . the jury's moral assessment of those facts as they reflect on whether defendant should be put to death . . . ." ' " (*People* v. *Brown* (1985) 40 Cal.3d 512, 540 [220 Cal.Rptr. 637, 709 P.2d 440].)

Indeed, the United States Supreme Court has said that even "unbridled jury discretion" at the penalty selection phase does not run afoul of the Eighth Amendment. In *Zant* v. *Stephens, supra,* 462 U.S. 862, the court, after noting the defendant's claim that the Eighth Amendment's "mandate . . . is violated by a scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute" said that such an argument "could not be accepted without overruling our specific holding in *Gregg.* For the Court approved Georgia's capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." (*Id.* at p. 875 [103 S.Ct. at p. 2742], fn. omitted; see also *People* v. *Bacigalupo, supra,* 6 Cal.4th at pp. 476-477 ["It would be inconsistent with the purpose and function of the section 190.3 sentencing factors to require those factors to satisfy the Eighth Amendment . . . . [¶] . . . Because they do not perform a 'narrowing' function, they are not subject to the standard that the United States Supreme Court articulated in *Godfrey* v. *Georgia* [(1980)] 446 U.S. 420 [100 S.Ct. 1759, 64 L.Ed.2d 398], and in *Maynard* v. *Cartwright* [(1988)] 486 U.S. 356 [108 S.Ct. 1853, 100 L.Ed.2d 372]."])

Here, the penalty selection instructions based on section 190.3 read to the jury were both correct and adequate. As we said in *People* v. *Sanders* (1995) 11 Cal.4th 475 [46 Cal.Rptr.2d 751, 905 P.2d 420], " '[T]he factors listed in . . . section 190.3 "properly require the jury to concentrate upon the circumstances surrounding both the offense and the offender, rather than upon extraneous factors having no rational bearing on the appropriateness of the penalty. We believe that the aggravating or mitigating nature of these various factors should be self-evident to any reasonable person within the context of each particular case." ' " (*Id.* at p. 564, quoting *People* v. *Zapien, supra,* 4 Cal.4th at p. 990; see also *People* v. *Bacigalupo, supra,* 6 Cal.4th at p. 477.) The trial court, being under no obligation to instruct the jury that factors (d) through (h) of section 190.3 could only be considered in mitigation of sentence, did not err in declining to do so.

Finally, other penalty instructions given by the trial court functionally satisfied defendant's claim that the jury should have been instructed that the

absence of a factor in mitigation could not be considered as a factor in aggravation. The jurors were told that *only* factors (a), (b), and (c) of section 190.3 could be considered in aggravation of the sentence, the plain implication to any reasonable person of that instruction being that the other factors could *not* be so employed. And, if that were not sufficient, both counsel in their respective closing arguments advised the jurors that the absence of a mitigating factor could not be considered in aggravation. (E.g., "[The prosecutor:] You are not to assume that because one factor is not applicable, that that's an aggravating factor. That would be incorrect." "[Defense counsel:] [Y]ou're going to be instructed that there are only three kinds of information that can be considered as aggravating, only three. [¶] Those three basically are the facts and the circumstance of this particular offense involving the death of Norma Painter; the second basically is the record that he has in the past of other criminal felony convictions; the third is other violent conduct. [¶] . . . [¶] [T]he law limits your consideration as to only those classes of conduct or events as aggravated, and then talks to you about the kinds of things that you can consider as mitigating."

We conclude the trial court properly instructed the jury at the penalty phase of defendant's trial regarding its assessment of aggravating and mitigating factors.

B. *Refusal to Instruct on Specific Mitigation Evidence*

 Defendant claims that the trial court erred when, at the close of the penalty phase of his trial, it refused to give the jury a defense-proposed instruction on specific evidence to be considered in mitigation. The proposed instruction comprised over 40 specific factors ranging from "whether defendant has a low sense of self-esteem and self-worth" to "the defendant's inability to meet the expectations of society which he perceived" to "the defendant's artistic potential." In his argument here, defendant characterizes his proposed instruction as a pinpoint instruction and relies on our holdings in *People* v. *Rincon-Pineda, supra,* 14 Cal.3d 864, and *People* v. *Sears, supra,* 2 Cal.3d 180.

Using language that is appropriate in this case, we rejected a similar argument in *People* v. *Noguera, supra,* 4 Cal.4th at page 648: "We upheld the trial court's refusal to give a similar, so-called 'pinpoint' penalty determination instruction—also urged on the authority of *Sears*—in *People* v. *Benson, supra,* 52 Cal.3d 754. We pointed out that 'Under *Sears* [a criminal defendant] ha[s] a "right to an instruction that 'pinpoint[s] the *theory* of the defense."' [Citation.] Here, as in *People* v. *Benson, supra,* the proffered special instruction for the most part in effect argued the evidence by

'highlight[ing] certain aspects . . . without further illuminating the legal standards at issue [citations].' [Citation.] Other instructions given by the trial court and summarized above adequately covered the defense theory in the penalty phase. Those elements of defendant's special instruction that were not argumentative were thus duplicative, and the trial court did not err in declining to give them. [Citation.] There was no error." (Italics in original.)

## C. *Refusal to Give "Benefit of the Doubt" Penalty Instruction*

 At the close of the penalty phase, defendant sought, and the trial court refused to give, the following instruction: "If you have a doubt as to which penalty to impose, death or life in prison without the possibility of parole, you must give the defendant the benefit of the doubt and return a verdict fixing the penalty at life in prison without the possibility of parole." Instead, the court instructed the jury in accordance with language this court had approved in *People* v. *Brown, supra,* 40 Cal.3d at page 545, footnote 19, as "conform[ing] to our opinion." Among other points, the instruction advised the jurors that "[i]n weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. [¶] To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." The instruction also told the jurors that "any mitigating evidence standing alone may be the basis for deciding that life without possibility of parole is the appropriate punishment. [¶] [Y]ou may consider sympathy, pity, compassion, or mercy for the defendant that has been raised by any aspect of the offense or of the defendant's background or character in determining the appropriate punishment."

Defendant contends it was reversible error for the trial court to refuse to give his requested "benefit of the doubt" instruction. That claim lacks merit. We recently reviewed and rejected a miscellany of related attacks on the principal penalty phase sentencing instruction, including the one raised here. (*People* v. *Medina* (1995) 11 Cal.4th 694, 781-782 [47 Cal.Rptr.2d 165, 906 P.2d 2]; see also *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 145-146 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People* v. *Melton* (1988) 44 Cal.3d 713, 761 [244 Cal.Rptr. 867, 750 P.2d 741].) Not only is the requested instruction not constitutionally compelled (*Lowenfield* v. *Phelps* (1988) 484 U.S. 231, 246 [108 S.Ct. 546, 555, 98 L.Ed.2d 568]), but the jury was adequately informed of its sentencing responsibility by the instructions the trial court *did* give.

## D. *Refusal to Instruct That a Sentence of Life Without Possibility of Parole Meant Defendant Would Never Be Paroled*

Defendant contends that his federal rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and analogous state rights were violated when the trial court refused to give his proposed instruction that a sentence of life in prison without possibility of parole would mean that he would never be paroled. He relies for that proposition on *Simmons* v. *South Carolina* (1994) 512 U.S. 154 [114 S.Ct. 2187, 129 L.Ed.2d 133] (*Simmons*). In *Simmons*, the high court ruled that when the prosecution urges a capital jury to sentence a defendant to death because of a potential for future dangerousness, the trial court cannot prevent the jury from learning the defendant is *not eligible* for parole. The trial court's failure to instruct the jury that the defendant was not eligible for parole under a sentence of "life imprisonment" violated his right to due process, the high court concluded. (*Id.* at p. 169 [114 S.Ct. at p. 2196].)

This case is different from *Simmons, supra,* 512 U.S. 154. First, here the prosecution did not argue that defendant's future dangerousness warranted the death penalty. Second, even if we assume, as we are urged to do, that evidence presented by the prosecution placed at issue defendant's future dangerousness, the trial court did not prevent the jury from learning that defendant was *not* eligible for parole. In *Simmons*, the jury was told to choose between a death sentence and life imprisonment without parole. Here, the jury was told that it could sentence defendant to either death or life imprisonment *without the possibility* of parole. In addition, in the course of their summation, defendant's trial counsel argued to the jury that defendant "will always be behind prison walls." Counsel also presented expert testimony to the effect that some prison rehabilitation programs are not available to inmates under sentences of life without possibility of parole because those programs would be "more profitably utilized for people who have a chance to be paroled at some point and returned to society." The trial court, therefore, did not err in refusing to give defendant's proposed instruction to the effect that a sentence of life in prison without the possibility of parole meant that defendant would never be paroled. (*People* v. *Padilla* (1985) 11 Cal.4th 891, 971-972 [47 Cal.Rptr.2d 426, 906 P.2d 388].) Indeed, as we noted in *People* v. *Gordon* (1990) 50 Cal.3d 1223 [270 Cal.Rptr. 451, 792 P.2d 251], " 'It is . . . incorrect to tell the jury the penalty of . . . life without possibility of parole will inexorably be carried out.' " (*Id.* at p. 1277, quoting *People* v. *Thompson* (1988) 45 Cal.3d 86, 130 [246 Cal.Rptr. 245, 753 P.2d 37].)

E. *Refusal to Instruct That Jury Could Consider Lingering Doubt About Defendant's Guilt in Reaching Penalty Decision*

Defendant argues that substantial evidence was presented during the guilt phase of his trial indicating that he suffered from organic brain damage and other mental disabilities when he killed Norma Painter. This evidence, defendant reasons, may have left the jury with lingering doubts about whether he had the mental capacity to satisfy the elements of murder of the first degree. The trial court's rejection of a proposed penalty phase instruction that lingering doubt as to defendant's guilt could be considered by the jury in arriving at a sentencing decision blocked the jury's consideration of powerful evidence in mitigation that would have justified a sentence short of death, defendant concludes.

In resolving the issue of penalty, a capital jury may consider residual doubts about a defendant's guilt. (*People* v. *Sanchez* (1995) 12 Cal.4th 1 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) Factors (a) and (k) of section 190.3 allow a capital defendant to argue innocence to the jury as a factor in mitigation. (12 Cal.4th at pp. 77-78.) It is settled, however, that neither federal nor state law *requires* the trial court specifically to instruct a penalty jury that it *must* consider residual doubt as to guilt in arriving at an appropriate penalty. (See, e.g., *Franklin* v. *Lynaugh* (1988) 487 U.S. 164 [108 S.Ct. 2320, 101 L.Ed.2d 155] [no constitutional right to instruction that jury may consider lingering doubt as factor in mitigation at penalty phase]; *People* v. *Sanchez, supra,* 12 Cal.4th at pp. 77-78; *People* v. *Cox* (1990) 53 Cal.3d 618, 677 [280 Cal.Rptr. 692, 809 P.2d 351] ["The fair opportunity to present relevance evidence and to argue forbearance thereon sufficiently preserves the defendant's interest in having the jury consider fully all germane aspects of the offense and the offender without requiring additional instructions guidance as to certain extenuating circumstance[s]."].)

In *People* v. *Price* (1991) 1 Cal.4th 324, 488 [3 Cal.Rptr.2d 106, 821 P.2d 610] (*Price*), the trial court instructed the penalty jury that in reaching an appropriate sentence it could consider any circumstance " 'that extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspects of a defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.' " We held this "factor k" instruction (§ 190.3, factor (k)) on the scope of mitigating circumstances sufficient to encompass the notion of residual doubt about a capital defendant's guilt. We decline defendant's suggestion that our decision in *Price* be reconsidered. Here, the trial court gave the jury the same factor (k) instruction concerning the scope of mitigating circumstances that was given the

jury in *Price*. Moreover, defendant's trial counsel argued before the jury at closing that, in reaching an appropriate penalty, they could consider any lingering doubt with respect to defendant's guilt.

Defendant argues that *People* v. *Thompkins* (1987) 195 Cal.App.3d 244, 256-257 [240 Cal.Rptr. 516], *People* v. *Cox, supra*, 53 Cal.3d at page 678, and sections 1127 and 1093, subdivision (f), support his claim that a more specific jury instruction governing residual or lingering doubt was required in this case. But *Thompkins* and the Penal Code provisions cited stand only for the proposition that on request, the trial court must instruct the jury on points of law pertinent to the legal issues presented. And our opinion in *Cox* recognized only that "[a court] may be required to give a properly formulated lingering doubt instruction when warranted by the evidence." (53 Cal.3d at p. 678, fn. 20.) Yet defendant provides no explanation why the factor (k)-derived instruction that *was* given to the jury failed to convey the notion of residual doubt in his case. The trial court did not err, we conclude, in declining to give the jury a more specific instruction on lingering doubt as a circumstance in mitigation.

## F. *Effect of Cumulative Penalty Phase Errors*

Last, defendant contends that even if no single error in the penalty phase of his capital trial was sufficient alone to merit reversal, in combination the aggregate effect of the several instructional errors asserted by defendant requires that the judgment of death be vacated. Our review of the record and consideration of the briefs and argument of counsel, however, have not disclosed errors of any significance which, either singly or in combination, require that the death sentence be set aside.

## IV. CONCLUSION

The judgment is affirmed in its entirety.

George, C. J., Mosk, J., Kennard, J., Baxter, J., and Werdegar, J., and Chin, J., concurred.

Appellant's petition for a rehearing was denied June 24, 1998, and the opinion was modified to read as printed above.