Filed 6/28/13  P. v. Kong CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054664 |
| v. | (Super.Ct.No. INF067592) |
| CHRISTIAN ANDREW KONG, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  David B. Downing, Judge.  Affirmed with directions.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Karl T. Terp, Deputy Attorneys General, for Plaintiff and Respondent.

1

Following a jury trial, defendant Christian Andrew Kong was convicted of second degree murder (Pen. Code,[1] § 187, subd. (a); count 1, lesser), three counts of attempted first degree murder (§§ 664, 187, subd. (a); counts 2-4, inclusive), and assault on a police dog (§ 600, subd. (a), a misdemeanor; count 5). The jury further found true the allegations that defendant personally discharged a firearm causing great bodily injury or death (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8); counts 1-4, inclusive), personally used a firearm, to wit: a revolver (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8); counts 1-4, inclusive), and that he personally inflicted great bodily injury (§§ 2022.7, subd. (a), 1192.7, subd. (c)(8); counts 1-3, inclusive). Defendant was sentenced to state prison for a determinate term of 4 years 8 months, plus an indeterminate term of 90 years to life. He appeals.

## I. FACTS

Beginning at the age of 16, defendant sold marijuana throughout the desert valley. In 2009 a friend, Melvin Hall, approached him about selling Ecstasy. By October of that same year, Hall was "fronting" the pills and defendant would use the proceeds from the sales to pay for them. For approximately three weeks, defendant dealt with Hall and then was introduced to Troy Hill,[2] Hall's roommate. According to Troy, Hall was developing defendant to eventually take over selling Ecstasy in the desert area.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Because both Troy Hill and his sister, Shayna Hill, testified, and since they share the same last name, we will refer to them by their first names.

In December 2009, defendant learned about a "rave" party in Orange County. Believing he could make a lot of money selling Ecstasy at the rave party, defendant purchased 300 pills from Hall for approximately $600-$800. Hall fronted an extra 100 pills to defendant for $250. On December 18, Hall and Troy arranged to meet defendant in Desert Hot Springs to collect money for the pills that were fronted to defendant. Defendant went to meet Hall and Troy armed with a fully-loaded gun. Shayna (Hill) and Deondre Gholar, who were visiting Troy, went with them to Desert Hot Springs. Hall was driving, and Troy was in the passenger seat. Gholar was seated in the backseat behind Troy, and Shayna was seated behind the driver. They arrived at a remote, dark, deserted area by Desert Hot Springs High School, and defendant approached the car wearing all black.

Troy asked defendant whether he had the money, and then Gholar, who did not know defendant, asked questions. Gholar turned on the dome light and asked if defendant could see him well enough. Shayna turned off the light, and without any warning, defendant pulled the gun out of his pocket, fired shots at Hall, backed up and shot Troy in the right cheek, and fired more shots, one of which hit Gholar in the leg as he tried to shield Shayna from the bullets. No one in the car was armed, and there were no weapons in the car. No one had threatened defendant, nor did defendant see anyone with a weapon. Troy denied having a weapon and testified that if he had, he would have shot back. Troy received immunity in exchange for his testimony.

Hall hit the gas pedal and drove through several parking lot planters before hitting a tree. When the car came to a stop, Shayna got out and saw that Hall was dead and the

3

others were shot. Troy was yelling for her to find a phone, and Gholar appeared to be losing consciousness. Shayna ran to get help because when she called 911 from her cell phone, her phone connected to Las Vegas 911 and she did not know where she was.

Demarcus Morris, defendant's friend, along with two other friends, were with defendant on the night of the shooting. Defendant had told them he planned to go pick up some "trees" (marijuana) and led them from his house to a dirt hill behind the high school, where he told them to wait while he walked over to the parking lot. Morris saw a white car pull into the lot, and defendant approached the passenger side. Morris heard someone ask why defendant was looking in the car, saw the dome light briefly go on, and then saw defendant fire shots into the car before running back to where they were behind the hill. They ran back to defendant's house. Defendant told Morris, "'if I would get caught, I would say it was self-defense.'"

Officer Miguel Preciado of the Desert Hot Springs Police Department responded to Shayna's 911 call and found Troy in the street bleeding profusely from a wound in his cheek. Troy identified defendant as the shooter and the officer called dispatch with defendant's name. The officer attempted to calm Shayna, who stated they had come to that area to buy marijuana from "Chris,"[3] and that when Chris came to the car dressed in black, her boyfriend asked why he was dressed that way. In response, defendant threw a bottle of pills into the car and opened fire with a gun. Hall was found dead in the front

---

[3] Troy also claimed they were buying marijuana; however, at trial he admitted it was lie because he did not want to get in trouble for selling Ecstasy.

4

seat of the car, while Gholar was lying on the ground with a gunshot wound to his leg. Gholar was hysterical and kept asking for paramedics.

A search of the car and the purse found inside the car produced no weapons or shell casings. In the center console, a baggie of a green leafy substance was found, along with Swisher Sweet cigars. No weapons were found along the trail of blood from the car.

A team of officers went to defendant's address. An officer saw defendant walking towards a tool shed in the backyard with something in his hand. He threw something into the corner of the shed. Defendant then walked away from the shed towards the rear of the yard, and when he attempted to flee through the fence, he ignored officers' orders to stop. Instead, he ran back into the yard towards the shed. Officer Merritt Rex, with his K-9 police dog Roy, repeated the order, informing defendant that he would release the dog, but defendant refused to comply. The dog was released as defendant approached the entrance to the shed. Defendant took a fighting stance, and as Roy lunged for him, he punched the dog. Roy got hold of defendant's hand, which enabled the officers to get control and give Roy a command to release defendant. A revolver wrapped in a bag with spent cartridges in the cylinder was retrieved from the shed. It was stipulated at trial that the revolver found in defendant's shed had fired two of the bullets collected by the Desert Hot Springs Police Department.

Defendant introduced evidence that around Thanksgiving 2009, Troy had threatened to kill Tanaya Hall and her son. Defendant knew Troy was a "Blood" gang member and believed that he was a bad influence on Hall. On the night of the shooting, when Troy, Hall, Shayna and Gholar pulled up in the car, defendant was expecting only

5

Troy and Hall. When Gholar started arguing with defendant, he felt "disrespected" and was frightened because they were "flamed up," wearing red, the color of the Blood gang. When the light went out in the car, defendant thought he saw Troy reaching for a gun and immediately opened fire, shooting blindly into the car and not aiming at anyone in particular.

Enrique Tira, a private investigator, was deemed an expert for purposes of criminal narcotics transactions. He testified that under similar circumstances, he would have felt threatened by Troy and others in the car and would have "prayed and sprayed," by blindly firing bullets in the car as he tried to run away from it.

## II. UNAVAILABILITY OF A WITNESS

Defendant contends the trial court erred when it found that the People exercised due diligence in securing Demarcus Morris's presence for trial. He argues that this error denied him his right to confront and cross-examine a witness.

### A. Further Background Information

In the prosecution's trial brief filed on April 15, 2011, the People requested permission to admit the preliminary hearing testimony of Morris if he could not be located. Defendant opposed the request. On April 25, the court held an evidentiary hearing on whether the prosecution had exercised due diligence when attempting to locate Morris. Gordon Govier, an investigator for the Riverside County District Attorney's office, testified as to his efforts to locate Morris, who was born in 1990: On February 24, 2011, Investigator Govier received a request to locate and serve Morris with a subpoena to testify. The investigator checked the Desert Hot Springs address

6

referenced in the reports, but Morris's family had moved. He checked several databases for an address, including the Department of Motor Vehicles, utilities, credit, and the Riverside Sheriff's Department data warehouse. An address on Majestic Prince Court in Perris was referenced, which led Investigator Govier to the house located at 2490. On February 28, the investigator spoke with Jennifer Randall, Morris's mother, who said she had asked Morris to move out of the house in November 2010 and she had had no further contact with him.

Investigator Govier continued to search other database systems. He personally contacted two investigators in Desert Hot Springs to alert them of the investigation. He learned that Deputy Ruben Martinez of the Riverside County Sheriff's Department had consensually contacted Morris on February 10, 2011. Although Morris gave the Majestic Prince Court address to the deputy, there was no further contact between Morris and the deputy. Investigator Govier provided the deputy with a flier, and Deputy Martinez asked a group of law enforcement agencies in Perris about Morris, but no one knew where Morris was. The deputy continued searching for Morris but never contacted Investigator Govier with any news that Morris had been found. The flier also went out to "Desert Investigators Association, law enforcement officers, probation, parole, [and] many different law enforcement agencies that meet every two months." About February 28, 2011, Investigator Govier went to the area where the contact with Morris had occurred, spoke to the people in the area who provided Morris's address, and canvassed the area.

Through continued contact with Randall, who had moved to Menifee, Investigator Govier learned that Morris associated with a friend named "Chris," and may have moved

7

to Desert Hot Springs with him. The investigator was unable to locate either of them. He ran Morris's name and social security number through the "CLETS system," checked for warrants, searched public utilities, checked phone directory databases, College of the Desert, the internet (including Facebook and MySpace), local hospitals, jail databases for San Diego, Orange, Ventura, Los Angeles, Riverside and San Bernardino Counties, and Morris's last known cell phone number, to no avail.

On the morning of the hearing, Investigator Govier again ran Morris's name through various databases and got a "new hit" on a Demarcus Morris in the state of Washington, but he lacked the time to follow up on this information. He was unable to cross reference the name with a social security number, birth date, or other identifying information. The computer hit was for cable utility and credit check. Investigator Govier opined that it may be the Morris he was looking for, because another witness, Wilford Venable, Jr., who was also associated with defendant, had a contact in the state of Washington. The investigator planned to follow up on this contact but needed to contact an investigator in Washington to do so.

The trial court found that Investigator Govier had exercised due diligence in attempting to locate Morris. The court also found that defendant had had a sufficient opportunity to cross-examine Morris at the preliminary hearing in March 2010, noting "there [are] almost 20 pages of cross-examination."

Defendant objected to the court's rulings. Regarding due diligence, defense counsel argued, "we feel the prosecution has failed to lay a sufficient basis for the unavailability of the witness as well as pursuing all reasonable leads." Specifically,

8

counsel pointed to the current lead in the state of Washington and argued its viability based on Investigator Govier's "other information about an associate of the witness's who is in the same area." The court interjected that Investigator Govier had just found out about the possible lead that morning and it could take weeks to get him back to California, assuming it was the Morris that the People were looking for. Nonetheless, the court instructed the investigator to follow up on the Washington lead. Defense counsel then criticized the investigator for not sufficiently investigating traffic tickets. The trial court also ordered the investigator to do that. Finally, defense counsel objected to the court's finding that there was a sufficient opportunity for cross-examination.

### B. Analysis

"A criminal defendant has the right under both the federal and state Constitutions to confront the witnesses against him. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) This right, however, is not absolute. The high court . . . reaffirmed the long-standing exception that '[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.' [Citations.] Evidence Code section 1291 codifies this traditional exception. [Citation.] When the requirements of Evidence Code section 1291 are met, 'admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution. [Citations.]' [Citation.]

"Evidence Code section 1291, subdivision (a)(2), provides that former testimony is not rendered inadmissible as hearsay if the declarant is 'unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or

9

proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.'  In turn, Evidence Code section 240, subdivision (a)(5) states a declarant is 'unavailable as a witness' if the declarant is '[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process.'"  (*People v. Wilson* (2005) 36 Cal.4th 309, 340-341 (*Wilson*).)  Because Morris testified at defendant's preliminary hearing and was subject to cross-examination, the only issue in this appeal is whether the prosecution used due diligence in its effort to obtain Morris's appearance at trial.

"The term 'reasonable diligence' or 'due diligence' under Evidence Code section 240, subdivision (a)(5) '"connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.  [Citations.]"'  [Citation.] . . . We independently review a trial court's due diligence determination.  [Citation.]"  (*Wilson*, *supra*, 36 Cal.4th at p. 341.)

Here, the prosecution first learned that Morris could not be located on February 24, 2011, when Investigator Govier attempted to contact Morris to serve him with a subpoena.  This was nearly two months prior to the start of trial.  Using multiple resources, Investigator Govier found Morris's mother and a deputy who had had contact with Morris as recently as February 11.  In addition to personally visiting Morris's mother, the investigator canvassed the area where the deputy had last contacted Morris.  The investigator prepared a flyer for circulation, searched various databases, and contacted local jails, the college and the hospital.  Nonetheless, defendant contends that

was not enough.  He faults Investigator Govier for failing to set up a surveillance of Morris's mother's home, failing to make a few unexpected visits, failing to "put a few boots on the ground" in Desert Hot Springs, and failing to personally check defendant's prior address.  Defendant argues that Investigator Govier did nothing more than "outsource passive efforts" to find Morris.

While defendant presents his hindsight suggestions of additional steps that could have been taken, "[a]n appellate court 'will not reverse a trial court's [due diligence] determination . . . simply because the defendant can conceive of some further step or avenue left unexplored by the prosecution.  Where [as here] the record reveals . . . that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually, as here, with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable."  [Citations.]  The law requires only reasonable efforts, not prescient perfection.' [Citations.]" (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)  In addition to the efforts taken, Investigator Govier continued searching for Morris through the morning of the April 15 hearing.  Moreover, "[t]he prosecution is not required 'to keep "periodic tabs" on every material witness in a criminal case . . . .' [Citation.]  Also, the prosecution is not required, absent knowledge of a 'substantial risk that this important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing.  [Citations.]" (*Wilson*, *supra*, 36 Cal.4th at p. 342.)  Defendant points to no evidence that the prosecution knew of any substantial risk that Morris would disappear.  For these reasons, we conclude that

11

the prosecution used reasonable diligence in its efforts to locate Morris, and that the trial court properly introduced Morris's testimony from the preliminary hearing.

In any event, any error in admitting Morris's preliminary hearing testimony was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) The prosecution's case was not based solely on Morris's testimony. Defendant did not dispute that he shot at the four victims, killing one of them. Instead, he claimed that he shot at them in self-defense. However, defendant also admitted that he never saw a gun, nor was he threatened by anyone before he opened fire. As the People point out, the fact that Morris had testified at the preliminary hearing that defendant said he would claim self-defense if he were caught, was no shock or surprise to anyone. Defendant spent all of his efforts attempting to develop a claim of self-defense.

### III.  CALCRIM NO. 505

When discussing the jury instructions, defendant requested several specific modifications to CALCRIM No. 505.[4]  Accepting most of the requested modifications,

---

**4** First modification in paragraph No. 1:  The sentence "The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury or was in imminent danger of being . . ." was changed to "The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury or was in imminent danger of being *robbed*."  (Italics added.)

Second modification in the paragraph beginning:  "If you find that Melvin Hall . . . ." was changed to "If you find that Melvin Hall *and/or Troy Hill* . . . ."  And the next paragraph beginning with the sentence, "If you find that defendant knew that Melvin Hall . . . ." was changed to "If you find that defendant knew that Melvin Hall *and/or Troy Hill* . . . ."  (Italics added.)

Third modification in the paragraph beginning with the sentence, "If you find that the defendant received a threat from someone else that he reasonably associated with, you may consider that threat in deciding whether the defendant was justified in acting in self-

*[footnote continued on next page]*

12

the court instructed the jury regarding self-defense based on CALCRIM No. 505: "The defendant is not guilty of murder or manslaughter or attempted murder or attempted voluntary manslaughter if he was justified in killing or attempting to kill someone in self-defense. The defendant acted in lawful self-defense if: [¶] 1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury or was in imminent danger of being robbed; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used *no more force than was reasonably necessary* to defend against that danger." (Italics added.)

On appeal, defendant argues the italicized language "misstates the law of self-defense because the amount of force used may exceed what might be [*sic*] appear to be objectively reasonable after the fact." While the objective reasonable person standard applies, defendant argues the jury must consider his "'subjective state of mind' because subjective knowledge informs the objective question of 'a reasonable person in defendant's position.'" Because defendant never requested any modification of the language he now challenges on appeal, the People contend he has forfeited this claim. (*People v. Dennis* (1998) 17 Cal.4th 468, 514; *People v. Tuggles* (2009) 179 Cal.App.4th 339, 364-365.) Defendant argues that his substantial rights were affected. (§ 1259.) Out

---

*[footnote continued from previous page]*
defense," was changed to "If you find that the defendant received a threat from someone else that he reasonably associated with *Melvin Hall*, you may consider that threat in deciding whether the defendant was justified in acting in self-defense." (Italics added.) However, the court declined to give the transferred intent language.

13

of an abundance of caution and because the People have briefed the merits of the issue, we will address defendant's challenge.

## A. Standard of Review

"Errors in jury instructions are questions of law, which we review de novo. [Citation.]" (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1424.) "In conducting this review, we first ascertain the relevant law and then 'determine the meaning of the instructions in this regard.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."' [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)

## B. Analysis

Defendant notes that he presented a serious claim of self-defense based on (1) Troy's prior threats and acts of violence against others; (2) Troy's possession of a gun; (3) Troy's gang membership; (4) Troy's aggressive texts about the drug debt; (5) Troy's showing up to the meeting with two unexpected people; (6) Gholar's aggressive questioning; and (7) defendant's own fear and anxiety about the meeting, which caused him to arm himself. Thus, defendant contends it is "reasonably possible that one or more jurors rejected [his] theory of self-defense by finding that he used more force than was objectively necessary to resist the danger he perceived [Troy] posed to his life."

We do not find defendant's contention persuasive. "The principles of self-defense are founded in the doctrine of necessity. This foundation gives rise to two closely related

14

rules . . . . First, only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified. [Citation.] Second, deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury; thus '[a] misdemeanor assault must be suffered without the privilege of retaliating with deadly force.' [Citations.] Under these two principles a person may be found guilty of unlawful homicide even where the evidence establishes the right of self-defense if the jury finds that the nature of the attack did not justify the resort to deadly force or that the force used exceeded that which was reasonably necessary to repel the attack. [Citations.]" (*People v. Clark* (1982) 130 Cal.App.3d 371, 380; see also *People v. Pinholster* (1992) 1 Cal.4th 865, 966 [any right of self-defense is limited to the use of such force as is reasonable under the circumstances], overruled on other grounds as stated in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

Defendant's attack on the language in CALCRIM No. 505 is isolated and fact specific. Regarding the language itself, as the People point out, defendant "cherry picked" one portion of CALCRIM No. 505, ignoring the remainder of the instruction. However, the remainder of the instruction informed the jurors of the numerous subjective factors they could consider in determining whether defendant's actions were objectively reasonable. Specifically, the jurors were told that "[w]hen deciding whether the defendant's beliefs were reasonable, [they may] consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." The jury was instructed

15

that "defendant's belief that he was threatened may be reasonable even if he relied on information that was not true."

If the jury found that "Melvin Hall and/or Troy Hill threatened or harmed the defendant or others in the past, [then they] may consider that information in deciding whether the defendant's conduct and beliefs were reasonable." Furthermore, if the jury found that defendant knew about Hall's and/or Troy's past threats or harm to others, they could consider such information "in deciding whether the defendant's conduct and beliefs were reasonable." Moreover, the jury could consider any past threats towards defendant as justification "in acting more quickly or taking greater self-defense measures . . . ." If jurors found that someone associated with Hall threatened defendant, they could consider such threat in deciding whether defendant's actions were justified. Finally, the jury was told that the burden remained on the People to prove, beyond a reasonable doubt, that the killing or attempted killing was not justified.

Reiterating the facts and the prosecution's closing argument,[5] defendant maintains the possibility that "at least one of these jurors rejected [his] claim of self-defense simply

---

[5] Defendant references the prosecutor's closing argument in support of his claim that the prosecutor "employed the erroneous language in CALCRIM No. 505 . . . ." However, he fails to mention that the quoted language from such closing argument was made in rebuttal to defense counsel's 32-point outline in support of the argument that defendant acted in self-defense. The prosecutor's initial closing argument focused on the objective evidence that defendant did not display any fear in the text messages with Troy; defendant chose the time and location of the meeting; he came in dark clothing; he was fully armed; and he lied about when and why he obtained the gun. The prosecutor also discussed the angle of the bullets in the victims' bodies. Regarding self-defense, the prosecutor noted that defendant never mentioned acting in self-defense or that the victims were gang members until he testified during the trial.

16

because he used more force than reasonably necessary from an objective point of view." We disagree. "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might." (*Boyde v. California* (1990) 494 U.S. 370, 380-381.) Given the entirety of the instruction, we find no reasonable likelihood the jurors found CALCRIM No. 505 as foreclosing application of his theory of self-defense, i.e., that they failed to understand they could consider defendant's subjective state of mind. (*People v. Musselwhite*, *supra*, 17 Cal.4th at p. 1248 [entire charge of court determines the correctness of the jury instruction].) Accordingly, we conclude CALCRIM No. 505 correctly stated the law.

IV. CALCRIM NO. 3472

While discussing the jury instructions, defendant objected to CALCRIM No. 3472, which cautions that self-defense may not be contrived. The prosecution requested the instruction based on Morris's testimony that after the murder, defendant never said he acted in self-defense, but said, "'I guess if I get caught, I'm going to say it's self-defense.'" Defendant claimed that Morris's statement did not establish that defendant provoked a quarrel, and no "reasonable view of the evidence supports it." In reply, the prosecution noted defendant's own words on the witness stand that "he was being disrespected and engaged in an argument, thus provoking the argument, and even said himself it started in the backseat and went up to [Troy], and he engaged in that quarrel." Defense counsel countered that the argument was provoked by Gholar. Over defendant's

17

objection, the trial court instructed the jury with CALCRIM No. 3472[6] on the grounds that "it may apply."

During closing argument, defense counsel argued the various facts supporting a claim of self-defense. He argued that Gholar was "an apparent Blood," an "extra, the older, flamed-up, first to speak, confrontational man" who spoke aggressively to defendant and caused him to think he would be robbed. Troy, another "flamed-up Blood gang member," threatened defendant earlier in the day, and defendant knew Troy had threatened to shoot another person previously. In rebuttal, the prosecutor noted that defendant, like Troy and Hall, was a drug dealer and that there was not a citizen standard, a gang member standard, and a drug dealer standard. "Self-defense applies to all equally." She argued that defendant was "so afraid of them that he called them four or five times. That makes no sense." According to the prosecutor, "half the factors that went into defendant's state of mind happened in 2011." Regarding provocation and defendant's belief that he was in imminent danger, the prosecutor submitted that defendant "*stood there and argued with everybody. He argued with [Troy]. He argued with Mr. Gholar. He went back and forth. He stood there and let it happen. He created the situation. He was just as provoking.*" (Italics added.) Concluding, the prosecution stated: "What really this whole thing comes down to is aggressive language. What really this whole thing comes down to is disrespect. It doesn't come down to another weapon; it doesn't come down to gang members. It comes down to drug dealers. . . . By all

---

[6] "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

18

parties it comes down to gang members. But at the end of the night, when he pulled that trigger six times, what it comes down to is that he was taking them out. He was disrespected. He thought about how do I get them all, and he took them out. [¶] . . . [¶] And what ended up happening is that he took a loaded gun to a drug deal and he killed people. There is no right to self-defense in this case. It cannot possibly be the standard. It cannot possibly be reasonable that words alone justified what he did to those People that night."

Referring solely to the highlighted comments above, defendant contends the trial court erred by instructing the jury with CALCRIM No. 3472. He argues there was "no evidence supporting the predicate finding that [he] provoked a quarrel in this case . . . ." Defendant further argues that the "effect of the error was to underinclusively delineate the scope of self-defense." We disagree. As demonstrated above, defendant has taken the prosecutor's argument out of context. When the entirety of the argument is considered, the prosecution's argument amounts to a rejection of the factors defendant gave in support of his claim of self-defense. It is clear that the prosecutor was arguing that defendant made up his story of self-defense, painting himself as an innocent young man who had to protect himself from the bad gang members. However, the evidence showed the possibility that defendant was the aggressor. Although defendant claimed to have obtained the gun on the day of the shooting, he initially told the officer he had obtained it a few weeks prior to the meeting he set up, and that it was for his protection. He arranged to have the meeting in a deserted area by Desert Hot Springs High School in the middle of the night. He arrived at the meeting armed and wearing all black. While

19

Gholar asked if defendant was the person they were waiting for, why defendant was looking inside the car, and why he was dressed all in black, Gholar also turned on the dome light, which allowed defendant to see inside the car. Defendant testified that he felt disrespected.

In light of the evidence, the jury was instructed on homicide (CALCRIM No. 500), justifiable homicide (CALCRIM No. 505), murder with malice aforethought (CALCRIM No. 520), various degrees of murder (CALCRIM No. 521), provocation (CALCRIM No. 522), various types of manslaughter (CALCRIM Nos. 570, 571, and 580), attempted murder (CALCRIM Nos. 600 and 601), and attempted voluntary manslaughter (CALCRIM Nos. 603 and 604), in addition to the right to self-defense (CALCRIM No. 3472). The jury was instructed under CALCRIM No. 200, duties of judge and jury, that some instructions given might not apply to the facts of the case. An instruction to the jury to disregard any instruction that is found not to apply to the facts "may be considered in assessing the prejudicial effect of an improper instruction." (*People v. Saddler* (1979) 24 Cal.3d 671, 684.) As discussed above, CALCRIM No. 3472 addresses the availability of self-defense when defendant provokes the fight or quarrel. As we have noted, there is evidence that supports this instruction. Nonetheless, if the jury did not agree, it could have disregarded CALCRIM No. 3472 based on CALCRIM No. 200. "[T]he jury is presumed to disregard an instruction if the jury finds the evidence does not support its application." (*People v. Frandsen* (2011) 196 Cal.App.4th 266, 278.)

20

For the above reasons, the trial court did not err in instructing the jury with CALCRIM No. 3472.

## V.  DENIAL OF MOTION FOR NEW TRIAL

Defendant contends the trial court erred by denying his motion for new trial, which was based on the testimony of a newly discovered witness that Troy was armed.

### A.  Additional Background Information

Defense counsel moved for a new trial on the ground that he had spoken to an inmate, Markeith Lane, who was purportedly in jail with Troy during the pendency of the trial.  Troy allegedly told Lane that on the night of the shooting he (Troy) had a gun that he always took on drug deal, that he hid it after the shooting, that he had someone get it for him, and that he colluded with his sister to deny there was a gun at the scene. Defense counsel offered a handwritten affidavit, which the court accepted.

In considering the motion, the trial court noted that defendant testified that he never saw a gun and there were no guns found.  Defense counsel argued that the defense was self-defense, and thus, this motion could not be accurately handled right now.  The court reiterated that the defense's main problem was defendant's testimony that he never saw a gun.  Defense counsel argued that given the prosecution's ridicule of the defense of justification, the new evidence would support and corroborate the defense of self-defense. The prosecutor pointed out that Troy had been impeached "from one side of the courtroom to the other," and unless defendant was going to take the stand and say he had been lying the entire time because he really did see a gun, the fact remained that he shot an unarmed man, because Troy "never took the gun out and pointed it at [defendant]."

21

The trial court observed that a new trial would not be granted unless the court was "convinced that at a retrial the new evidence could result in a different result."

The court noted that defense counsel "basically viscerated [*sic*] [Troy's] testimony. You made him look like the liar he was. You did. Not only did he lie about being a Denver Lane Blood, but you brought a cop from Pasadena in here who testified very credibly, I might add, watching [Troy] with the community gun, as he called it, and the dope. So you basically destroyed anything [Troy] had to say before the jury. [¶] But the bottom line is still the same. The only thing [Troy] said here is he got shot. . . . [H]e didn't lie about that part is my point; that part he told the truth about. It may be the only part he told the truth about." Concluding there was no probability that the new evidence would produce a different result, the court denied the request. Defense counsel argued that the new evidence would corroborate the testimony of their expert. Nonetheless, the court reiterated that defendant testified that he never saw a gun. Had he testified otherwise, the court would have granted the motion.

**B. Analysis**

A trial court may grant a motion for new trial when (among other things) "new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. . . ." (§ 1181, subd. 8.) "'In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not

22

with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.'" [Citations.]' [Citation.]" (*People v. Howard* (2010) 51 Cal.4th 15, 43.) "'"'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.'" [Citations.]'" (*Id.* at pp. 42-43.)

Based on the record before this court, we cannot conclude that the trial court abused its discretion in denying defendant's motion for new trial. The new evidence did not rebut the strongest evidence against defendant, namely, that he chose the location of the meeting, he came armed, and he never saw a gun in the victims' car or in their possession. Given defendant's testimony that he never saw a gun, the newly discovered evidence would not make a different result more probable on retrial. (*People v. Ochoa* (1998) 19 Cal.4th 353, 473.) Moreover, the newly discovered evidence did not destroy Troy's credibility. As the trial court observed, Troy's credibility was already eviscerated by defense counsel. Thus, to the extent the newly discovered evidence would merely impeach Troy, it was cumulative. Generally, evidence that simply impeaches a witness is not significant enough to grant a motion for new trial. (*People v. Hall* (2010) 187 Cal.App.4th 282, 299.)

Because the asserted newly-discovered evidence was cumulative impeaching evidence and would not have rendered a different result on retrial probable, the trial court did not abuse its discretion in denying his new trial motion. (*People v. Delgado* (1993) 5 Cal.4th 312, 328-329.)

23

## VI. PRESENTENCE CUSTODY AND CONDUCT CREDITS

Defendant claims the trial court erred in failing to award presentence credit to him. Acknowledging that the trial court failed to grant any custody credits to defendant, the People contend that he is ineligible for such credits because he was convicted of murder.

Section 2933.2 provides in relevant part: "(a) Notwithstanding Section 2933.1 or any other law, any person who is convicted of murder, as defined in Section 187, shall not accrue any credit, as specified in Section 2933 or Section 2933.05. [¶] . . . [¶] (c) Notwithstanding Section 4019 or any other provision of law, no credit pursuant to Section 4019 may be earned against a period of confinement in, or commitment to, a county jail, industrial farm, or road camp, or a city jail, industrial farm, or road camp, following arrest for any person specified in subdivision (a)." However, section 2900.5 awards defendant credit for all days spent in custody. This provision applies to all defendants. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.) The probation officer calculated defendant's actual time in custody (from the date of his arrest until sentencing) as 630 days. Neither party disputes this calculation. Thus, defendant was entitled to 630 days of actual custody credit. We order the judgment to be modified to correct this error.

24

## VII.  DISPOSITION

The abstract of judgment is modified to give defendant 630 days of custody credit. The trial court is directed to amend the abstract of judgment accordingly and to forward a copy thereof to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

      HOLLENHORST      

Acting P. J.

We concur:

RICHLI

      J.

MILLER

      J.

25